## Case No. 4,790.

FINDLAY et al. v. The WILLIAM.

[1 Pet. Adm. 12.] [1]

District Court, D. Pennsylvania.   June 21, 1793.

PETERS, District Judge. The libel states that the libellants [Robert Findlay and others, subjects of Great Britain] are owners of the ship mentioned in the libel, and that

---

[1] [Reported by Richard Peters, Jr., Esq.]

the said ship being on her voyage from Bremen to Potowmac river, in the state of Maryland, and within nine miles of the sea coast of the United States, received an American pilot on board, for the purpose of conducting her to the place of her destination. That, after receiving the pilot on board, she continued her course until she arrived within two miles of Cape Henry, in five fathoms water, and as near the shore as the pilot thought proper to go; when she was seized by a number of armed men, under the command of Peter Johannene, captain of the schooner Citizen Genet, and bearing the national colours of France, as a prize, and the captain and crew made prisoners. That they do not admit, but pray that it may be enquired into, whether the schooner was commissioned or not. That the said ship was, at the time of her capture, within the territorial jurisdiction, and under the protection of the United States; who are now at peace with the king and people of Great Britain. That the persons so capturing had no authority from or under the United States, to capture British vessels within that distance of the sea coasts, to which, by the laws of nations, and the laws of the United States, the rights and jurisdiction of the United States extend. They therefore pray that, as the capture and detention are unjust, and against the laws of nations, and of the United States, the ship and cargo be discharged, and the prisoners liberated, and satisfaction given in damages for the capture. To this a plea was offered on the part of Pierre Arcade Joannene, a French citizen, on behalf of himself and all concerned in the capture, setting forth, that he was at that time, &c. commissioned by the French republic, to attack &c. the enemies of the said republic wherever he might find them, and take them prisoners with their ships, &c. That he took the ship, &c. and the persons on board, who were subjects of his Britannic majesty, then at open war with the republic of France, and brought the ship as prize, and the people as prisoners, into the port of Philadelphia; and alleges that, by the laws of nations, and the treaty between the United States and the said republic, it doth not pertain to this court, nor is it within the cognizance of this court to hold plea respecting the said ship and property, so taken as prize, or the British subjects on board her, and prays that he may be dismissed, and the ship and cargo discharged. To this the libellants put in a replication in the nature of a demurrer to the plea, and because the ship &c. were captured in the territory of the United States, prayed a sentence and decree, according to the force, form and effect of their libel. The commission from the French republic, whereby it appears that the said schooner Citizen Genet was duly commissioned, &c. was produced, and a copy thereof filed among the proceedings of the court.

In this cause it has been contended, in sup-

port of the plea to the jurisdiction of the court: 1. That the treaty between France and the United States, in its 17th article, forbids any examination of the lawfulness of prizes taken by either party when at war, by the officers, which include judges or courts, of the other; and that such prizes may enter into the ports of either party, and depart at pleasure, without search or any impediment; and that this court should immediately stay proceedings when the commission is produced under which the capture in question was made. 2. That, by the laws of nations, to which the treaty is conformable, a neutral nation has no right to be the judge, either of the lawfulness of the war between belligerent powers, or of their conduct towards each other in the prosecution of hostilities. That undertaking to determine on the question of prize, in this case, would be interposing our judgment not only illegally, but in a manner unprecedented; there being no instance to be found, in which the courts of a neutral nation have ever exercised jurisdiction in such cases. 3. That, by the voluntary law of nations, every war is considered by parties, as well as neutrals, just as between such parties, and all acquisitions lawful. If these acquisitions are disputed, it must be in the courts of the nation to which the captor belongs, and cannot be the subject of enquiry in those of a neutral nation, even at the instance of the neutral sovereign, much less at the suit of private subjects of one of the belligerent powers, against those of the other. 4. That the right of entry and sale of prizes, in neutral ports, is lawful; and it is sufficient for the neutral that the prize is found in complete possession of one of the powers at war, or their subjects. No judiciary enquiry should be made on the occasion. But if, in the capture, an invasion of the territorial rights of the neuter has been made, it must be canvassed by the diplomatic body, and finally settled by the sovereigns of the neutral and of the belligerent nation whose subjects have done the wrong. It is an offence against the neutral nation, and not an injury to the captured.

To shew that the court have jurisdiction in this case, the advocates for the libellant contended: 1. That every sovereign and independent nation has a right to vindicate a wrong done to its dignity, and to repel, and obtain satisfaction for, invasions of its territory. 2. That the attacking and capturing the vessels of a friend, coming into the ports, or acting in a hostile manner, by one belligerent power against another, within the limits of a nation at peace with both, is a wrong done to the nation so at peace, an insult on its sovereignty, and an invasion of its territorial rights. 3. That we are bound, by the laws of nations, to seek reparation for the wrong thus committed, as well on our own account, as to enable us to give satisfaction to a friendly nation. the property of whose subjects has been taken within our limits.

4. That all captures made within the territories of a neutral, either on land, in their ports or harbours, or on their coasts to a certain distance from the land, are unlawful, and ought by the laws of nations to be restored. 5. That the word "prizes" in the treaty means "lawful prizes," and illegal captures are as none, so far as relates to the subject matter of the treaty, and, therefore, were not the objects of the contracting parties, at the time of making it: and it could not have been the meaning of the treaty to let captures in a neutral country pass without enquiry. 6. That this is not judging of the war between the neutral powers; it is an enquiry into an allegation of an invasion of territorial rights. Every nation is obliged to take care of its own preservation; it has a right to prevent any other injuring its security, and may make use of force to retaliate injustice, to prevent injury to its territory, and to punish the invaders of its privileges. 7. That we are bound by treaty to be at peace with the sovereign whose subjects and their property have been captured, and, unless restoration is made, and the property of these subjects protected, our engagements may be considered as violated. We are also bound to protect and defend the ships and merchandise of Prussia, Holland and Sweden, if attacked on our coasts, &c. and if captures take place, to use our endeavours to cause restitution to be made. 8. That the best mode of causing restitution is through the courts of admiralty, by process in rem, when the capture is within their power. These courts proceed according to the laws of nations, and, in a government like ours, are the only tribunals that can properly be applied to. In despotic sovereignties, force may immediately be applied; but here ours is a government of laws, and our executive is not vested with the authority exercised by sovereigns in such cases. All he can do is to represent and negociate, and his representations may be slighted, and our government treated with indignity. If there is no power in this court to effectuate the purpose required, it does not exist any where. The reason why cases of admiralty adjudications and interferences cannot be produced, is that captures have seldom been carried into the ports of the injured neutral. And those who commit these outrages will take care not to put the property into the power of the injured, unless it shall appear they can do it with impunity. If they can dispose of their prizes here, they will not go to their own courts to have them condemned. 9. That though it is true that a remedy may be applied by negotiation and diplomatic discussion, and ultimately by force, yet the remedy through the courts of admiralty jurisdiction is a concurrent one. It is also the less liable to objection, as these are courts regulated by the laws and customs of all nations, and not liable to political bias, or entangled in political considerations. They are also courts, to

whose decisions, for reciprocal benefit, all nations pay a particular respect.

I have given this subject every consideration I am capable of, and have deliberated on the arguments and authorities brought forward by the advocates on both sides the question, with the attention they justly merit. But it seems to me that much has been said not immediately applicable to the only point I have now to determine, to wit: Whether this court is vested with the power to enquire into the legality of the prize, and to investigate the fact on which all the reasonings are founded? If this fact is established, and the extent of our territorial limits ascertained, so as to make it clear that a capture has been made within the territories of the United States, there is not a doubt but that a flagrant violation of the rights of neutrality has been committed. Vatell, l. 3, § 132; Lee, c. 9, p. 151. And this is followed by many of the consequences mentioned by the advocates for the libellants, so far as they respect our national dignity and duty towards a friendly power, in endeavouring to cause restitution or recompence to be made. Nor does this seem to be denied by the other side of the question. But the embarrassment still exists. Who is to enquire into the matter, and either give or attempt the redress? It is difficult for a neutral nation, with the best dispositions, so to conduct itself as not to displease one or the other of belligerent parties, heated with the rage of war, and jealous of even common acts of justice or friendship on its part. Neither is it easy for the nations at war to restrain their subjects from acts of violence, even in the territories of their friends. The least under control are those whose object is not honourable conflict, or patriotic exertion. These are actuated by a spirit of lucre, which not only incites to plunder the base and lawless freebooter, but tarnishes even heroism, by seducing into unjustifiable actions the bravest men. It would be for the interest of nations, and the happiness of mankind, if, by universal consent, the quarrels of nations were prevented from being turned to the purposes of private advantage. But the swords of those who fight for gain will not, in our day, be beaten into ploughshares. We must take nations and men as we find them, and consider as lawful what those at war authorize, so far as it respects the parties engaged. After all, it depends much on the interest, the convenience, or the good temper of governments, whether a neutral shall or shall not be engaged in war. A prudent and just conduct, on the part of the neutral particularly, is the surest preventive. But how to evidence this, is a matter of consideration with those to whom the government is delegated. The simplest mode of evincing our impartial disposition, is to confine ourselves to the customs of other nations in our predicament; an over anxious zeal to avoid contests may otherwise lead us into errors; and, while we are endeavouring to avoid one rock, we may split on another. Mutual toleration must be exercised; for those who are at war, and those who are not, have their share of difficulties on this subject. Under this view of the matter before me, I have given a patient hearing to both sides; and have particularly attended to the arguments by which it has been endeavoured to establish a jurisdiction in this court. It must certainly be allowed, by the advocates for the libellants, that they have not been able to shew any direct authority upon the point. For the two cases of the Duke of Tuscany (Lee, 131) seizing the vessel committing the outrage near the port of Leghorn, and that of the king of England (Bynk. c. 8, p. 177; Molloy, 85) ordering restitution of the effects taken out of the houses of the inhabitants, and belonging to a ship of a friendly power, driven by its enemy on his shore, appear to have been acts of power and not done in consequence of decrees or orders of courts of admiralty. Yet these jurisdictions existed, in both the countries above mentioned. The case of Captain Landy, in the American frigate Alliance, who was ordered by the court of France to restore a ship taken by him, is not in point (2 Code de Pris, p. 877), for the Forsters, who appeared as owners, were either subjects of, or persons resident and domiciliated in, France, and the ship was sailing under a passport of that nation. They, therefore, could not be considered as enemies; and, the capture not being made from enemies, the case was not comprehended in the treaty, or the capture authorized by the laws of nations. In the case falling under the notice of the king of England (except that of his having the powers of peace and war, as an appendage to which he might have exercised this kind of authority) I should not have supposed him vested, without an act of the legislature, with the authority he used; and it is doubted, by Bynkershoek, whether he did right in interfering at all on the occasion. If it be consistent with treaties, and otherwise right, our legislature can vest the executive in future with similar powers. I should suppose, too, that the liberty of selling prizes, in a neutral country, is not a perfect right; and may also be considered, by our national legislature, as a subject of regulation. If any captures are made within our limits, and the vessels or plunder is brought within our ports, the sale may be forbidden. They must then be either abandoned or carried within the jurisdiction of the captors, where the proper courts will consider of their legality. Yet this is a matter, not of judicial, but political arrangement; and must be left to those who have the authority to direct. The sovereignty of our nation is as complete as that of any other; therefore, whatever other sovereigns can do, we have in our power. But because, at this time, the authority, supposed necessary on this occasion, is not

as it is alleged, to be found in the executive branch, I do not see that the judiciary ought to exercise it, as a consequence resulting from political convenience, or the necessity of the particular case. This, I fear, would be a novelty dictated by our zeal, and might give cause of offence to one, while we were aiming at justice to ourselves, or gratification to the other. I hesitate not to use any plain authority I know this court to possess, let the consequence be what it may; but this is a question too important in its effects, to be acted on but on the surest grounds. I agree here, as I do in many of their other positions, with the advocates for the libellants, when they say that "courts of admiralty jurisdiction are less liable to objection, as these courts are regulated by the laws and customs of all nations, and not liable to political bias, or entangled in political considerations." This should induce the greater caution in their determinations. I have not seen any proofs that "the laws and customs of all nations" warrant the interference of this court. If they do not, no authority can be derived from our own laws, if they were not silent on the subject. In the existing arrangement of our government, we did not calculate on our relative situation, as to contests between other nations. If, for this reason, no immediate remedy is at hand, who can justly censure the executive, when he has given decided evidence of his impartial and just inclinations? Who can with reason blame the judiciary, if they will not assume a power not conceived to be vested in them? Not the government of the country, whose subjects are the libellants, and to whom I wish every degree of justice may be done. The principles established in the decisions of their own courts, and the opinions of their most celebrated lawyers in the contest with the king of Prussia in the Case of The Silesia Loan, in a great degree reach the point, as to judiciary authority in a neutral nation. In Palachie's Case, 1 Rolle, 175, I am aware that it is only said the vessel "was taken at sea," but if not, it rather appears, that it would be more proper for a diplomatic than a judiciary examination. The general principle, as to the capture, is agreed; and is similar to that established in our treaty with France, which ought to have its proper weight. 4 Inst. 154. "It was resolved, by the whole court of king's bench, upon conference and deliberation, that the Spaniards (whose ship had been taken by an enemy and brought into England, a friend to both parties) had lost the property of the goods forever, and had no remedy for them in England; and it relied principally upon the book in 2 Rolle, 3, ubi supra, being of so great authority; for, by that book, he that will sue to have restitution of goods robbed at sea, ought by law to prove two things: 1. That the sovereign of the plaintiff was, at the time of the taking, in amity with the king of England. 2. That he who took the

goods was, at the time of the taking, in amity with the sovereign of him whose goods were taken: for, if he who took them was in enmity with the sovereign of him whose goods were taken, then was it no depredation or robbery, but a lawful taking, as every enemy might take from another." It is true that, by the laws and customs of nations, the capture, if taken in neutral bounds, is not lawful prize. Woodeson, 443. But I do not see that this court can get at that circumstance, without holding plea as to the lawfulness of the prize.

It is the original question, and not collateral matter, which determines jurisdiction. The courts of common law in England will not take cognizance of anything arising out of the question, prize or no prize (Le Caux v. Eden, Doug. 612), "because the original cause must all come into question again:" and yet the admiralty had determined that the ship was no prize. This will be a proper subject of enquiry on the part of our government, or in a court of the country of the captor. Every nation has established these courts, and knowing that, if at war, they are answerable to a nation at peace, or in amity; if violations of territory happen in captures, care is taken to examine into this circumstance. If, on this account, the capture is illegal, it is so adjudged; and the party taking is liable to damages. Whether such damages shall exceed the amount of the security given by commanders of private ships of war, or whether one nation is answerable to another for injuries done by its subjects to others, contrary to or without its orders, is a matter in which there are differences of opinion among civilians (Lee, 226–231, 222; Grotius de J. B. & P. l. 2, c. 17, § 20), and which it is unnecessary for me now to investigate. It is doubtless contrary to the instructions of the French government, that any of the ships, commissioned by them, act in a hostile manner in a friendly and allied territory. It is to be expected by one power from another, that her courts and her administration will do justice to the rights of sovereignty and neutrality. It will be the more to be lamented if a friend and ally should disappoint this expectation. But, should this be the case, it is not for me to say what proceedings should be had. I have subjoined to this decree some extracts from the "expositions of the motives, &c." from the duke of Newcastle, the British minister's letter to Mr. Mitchell, the minister of Prussia, and from the report and opinion of Sir George Lee, Dr. Paul, Sir Dudley Rider and Mr. Murray, the late Lord Mansfield, on the subjects I have mentioned, which are to be found in Magens, 463, 482, 487, 491, 496, 505.[2]

---

[2] 1 Magens, 505. Each crown has no doubt an equal right to erect admiralty courts for the trial of prizes taken by virtue of their respective commissions, but neither has a right to try the prizes taken by the other, or to reverse the sentences given by the other's tribunal. The

Other authorities from British and other writers might be added, by which it appears, that when two powers have any difference between them, the affair must be treated by negotiation, and not through the instrumen-

tality of their courts of justice. That affairs of prizes are only cognizable in the courts of the power making the capture: these courts being generally styled courts of admiralty; and, that it never was attempted, before the subject of that controversy happened, to erect in a neutral state courts for the trial of prizes, taken by belligerent powers, even where neutrals were concerned; and that, of course, no court of one sovereign has a right to try the prizes taken by the ships, public or private, of another.[3] A dispute of this nature, in which the king of Prussia could not prevail, who, though weak at sea, was powerful at land, and had a propensity for war, would not very well suit us. We have, indeed, shewn that we know how to make war, but it is now our interest and inclination to cultivate the arts of peace. Much has been said, on both sides, to shew the importance of this cause, and the necessity of caution in its determination. I am sufficiently impressed with those considerations; but I feel myself at ease in this view of the subject. I am persuaded that any thing which affects the sovereignty and rights of our country will not be passed unnoticed by those who have the power to regulate our national concerns. On my own account, I have no disquietude; for no error of mine can affect the nation. There is an appeal, from any determination I may give, to a superior tribunal. I am anxious for the peace and dignity of my country, but not deeming myself authorized to decide in a matter growing out of the contests between belligerent powers, nor considering this court, in this instance, the vindicator of the rights of our nation, I leave in better hands the discussion on the subject of national insult, and the remedy for any invasion of territorial rights.[4] The instance side of this court seems to have other objects; and a prize court, called into activity when

---

only regular method of rectifying their errors is by appeal to the superior court.

1 Magens, 491. If a subject of the king of Prussia is injured by, or has a demand upon, any person here, he ought to apply to your majesty's courts of justice, which are equally open and indifferent to foreigner or native: so, vice versa, if a subject here is wronged by a person living in the dominions of his Prussian majesty, he ought to apply for redress in the king of Prussia's courts of justice. If the matters of complaint be a capture at sea, during war, and the question relative to prize, he ought to apply to the judicatures established to try these questions. The law of nations, founded upon justice, equity, convenience and the reason of the thing, and confirmed by long usage, does not allow of reprisals, except in cases of violent injuries, directed or supported by the state, and justice absolutely denied in re minime dubia, by all the tribunals, and afterwards by the prince. Where the judges are left free, and give sentence according to their conscience, though it should be erroneous, that would be no ground for reprisals. Upon doubtful cases, different men think and judge differently, and all a friend can desire is, that justice should be as impartially administered to him, as it is to the subjects of that prince in whose courts the matter is tried.

1 Magens, 496. For as to the Prussian commission to examine these cases ex parte, upon new suggestions, it never was attempted in any country in the world before. Prize or no prize must be determined by courts of admiralty, belonging to the power whose subjects make the capture. Every foreign prince in amity has a right to demand that justice shall be done to his subjects in these courts according to the law of nations, or particular treaties, where any are subsisting. If, in re minime dubia, these courts proceed upon foundations directly opposite to the law of nations, or subsisting treaties, the neutral state has a right to complain of such determinations. But there never was, nor ever can be, any other equitable method of trial. All the maritime nations of Europe have, when at war, from the earliest times, uniformly proceeded in this way with the approbation of the powers at peace.

1 Magens, 487. By the maritime law of nations universally and immemorially received, there is an established method of determination, whether the capture be or be not lawful prize. Before the ship or goods can be disposed of by the captor, there must be a regular judicial proceeding, wherein both parties may be heard, and condemnation thereupon as prize in a court of admiralty, judging by the laws of nations and treaties. The proper and regular court for these condemnations is the court of that state to whom the captors belong.

1 Magens, 482. First, that affairs of this kind are and can be cognizable only in the courts belonging to that power, where the seizure is made, and consequently that the erecting foreign courts or jurisdictions elsewhere, to take cognizance thereof, is contrary to the known practice of all nations in like cases, and therefore a proceeding which none can admit.

1 Magens, p. 463, § 47. When two powers have any difference between them, neither of them can on either side appeal to the laws of the country, because one of the two parties does not acknowledge them. The affair then must be treated in the way of negotiation from court to court, and the difference can only be decided with the consent of both parties according to the laws of nations, or by the means founded thereon.

---

[3] See on this point the case of The Flad Oyen, 1 C. Rob. Adm. (Philadelphia Ed.) 135, Id. (English Ed.) 137. In the case the question is discussed with great learning and ingenuity by Sir William Scott. See, also, the case The Kierlighett, 3 C. Rob. Adm. (Philadelphia Ed.) 96, Id. (English Ed.) 29.

[4] When this cause was decided, no territorial limits were established by any national act. The facts were not accurately investigated. On the exhibition of the testimony, it did not appear to me to be clearly ascertained that the place of capture was left without doubt, as to its distance from the shore. The whole of the case was novel in the United States. There is no point on which the writers on maritime laws and privileges so much disagree, as on that of the extent of the territorial rights of the sovereign possessing the shores, into the contiguous sea. All maritime people deem the nation in rightful possession of the coast, sovereign of the adjacent sea; yet there is no general agreement as to the nature or extent of this sovereignty. Time has not matured or settled opinions on this subject among jurists; nor have particular compacts established any general principle. From the period of the compilation of the Digest of Justinian, to this day, the point has been uncertain, and open to controversy. Some early commentators on that work assert that the territorial sea extended 60 miles from the shore. A majority of ancient writ-

a nation is at peace, appears to be a solecism in jurisprudence. I do, therefore, decree, order and adjudge, that the libel in this cause be dismissed; and that the ship therein mentioned be discharged from the arrest, the plea in this case being relevant.

ers carry it to 100 miles. Valin endeavours to ascertain it by the sounding lead; whether the coast be composed of extensive shallows and flats, or bold and deep shores! Others fix the distance at the point capable of being defended from the shore. Hubner, the champion of neutral rights, thinks the limit ought to be the range of a cannon shot; and of this opinion is Bynkershoek, Vattel and other eminent civilians, and among them Azuni; who, in volume 1, pp. 193–208, discusses the point, and cites many authors, and some treaties and documents. It seems to be a claim of power in extent, though of justice in its origin: and when viewed according to the contradictory opinions of writers, it appears difficult, doubtful, and often visionary. It is even left by some to the determination of those, whose wants, or convenience, require a greater or less distance from the shore. Some have need of more sea room for fishing; and it suits others to distinguish between extent for operation of revenue laws, and that for protection of neutral trade; the latter, these say, must be at the greatest distance. The range of a cannon shot is generally accounted about a sea league. Our act of congress (3 Stat. 91), fixes that distance, on the maritime territorial limits, for our nation: and gives the district courts jurisdiction to that extent, of captures made in violation of our territorial rights; by the law, passed after the foregoing decree, to wit, in June 1794, as opinions were various on that point, the extent might have been declared greater, without violating the pretensions or just claims of others. There is no doubt of the right (if they have the power) of any nation, to forbid and prevent captures, at a greater distance than the sea league from their coast. Nor can it be fairly questioned that, where coasts are indented, or firths or bays are included in the territory of a nation, what are called chambers, by Sir L. Jenkyns, may be established. These are parts of the ocean included within lines drawn from promontory to promontory, or perhaps from points a league distant from each. And it is not a question to be made by any other nation, whether some parts of the space included be or not more than a sea league from the shore. It seems, on the whole, a point for treaty or compact, or one left to the discretion of sovereign states. But, in fixing extent of maritime territory, they must not invade the rights of others; or pass into, so as to disturb or obstruct, the common path-way of nations, in its freedom of navigation. To this freedom all are entitled on the high seas, which are called the high road, through an expanse given by the creator, to be held in common; indivisible and incapable of allotment, in separate ownership, or propriety. In a case of similar circumstance, this subject was, at the time, discussed more at large. But the notes of that case (The Fanny [unreported]) are mislaid.