(PRIZE.)

## The ARROGANTE BARCELONES. The *Consul General of Spain, Claimant.*

This Court will restore to the former owners property captured in violation of the neutrality of the United States, where it is claimed by the original wrong-doer, though it may have come back to his possession after a regular condemnation as prize.

*Quære,* How far a condemnation would protect the title of a third person, being a *bona fide* purchaser, without notice, in such a case ?

APPEAL from the Circuit Court of Maryland.

This was a libel filed by the Consul General of his Catholic Majesty, in the District Court of Maryland, against the Spanish ship Arrogante Barcelones, and cargo, praying restitution to the original Spanish owners, upon the ground of the same having been captured on the high seas, in violation of the laws, treaties, and neutral obligations of the United States, and brought within their territorial jurisdiction. A claim was filed by Joseph Almeida, who insisted upon his title as a *bona fide* purchaser, under a capture made by the Buenos Ayres privateer, Louisa, and a regular sentence of condemnation in the Prize Court at Juan Griego, in the Island of Margaritta, within the territory of a co-belligerent. It appeared, by the proofs taken in the cause, that the capturing vessel was a prize to the Buenos Ayrean privateer El Congresso, and was purchased by the claimant, Almeida, armed and equipped by him at Ensenada, and in April, 1818, came to Baltimore

to be refitted. She was there refitted, and sailed from that port in August, 1818 under the command of the claimant, ostensibly bound on a sealing voyage to the North West Coast of America, with a crew of ninety-six men, principally citizens of the United States; and armed with ten guns and some small arms. The ship anchored off Patuxent, and there received a considerable addition to the armament. Before the crew left Baltimore they had signed the usual ship's articles for the voyage; but after they had been at sea some days, the claimant produced privateering articles, which he required them to sign. Some of them refused, and were put in irons, and two were put on board another vessel. The crew finally signed the articles, and proceeded to cruize off Lisbon, where, on the 9th of September, 1818, they captured the Spanish ship Arrogante Barcelones and cargo, and proceeded with them to the port of Juan Griego, in the Island of Margaritta, where proceedings were instituted, under which the ship and cargo were condemned in the Court of Admiralty as Spanish property and good prize of war, and purchased by the claimant at public auction. The copy of the sentence produced in evidence was certified by the Notary or Secretary of Marine, and his signature was verified by the certificate of Lino Clemente, deputy of the Republic of Colombia to the United States, but who had not then been received in that capacity by our government.[a] Decrees of restitution to the original Spa-

1822.

The
Arrogante
Barcelones.

_a Vide ante, Vol. IV. Appx. p. 49._

nish owners were entered, *pro forma*, in the District and Circuit Courts, and the cause was brought by appeal to this Court.

*Feb. 22d.*     Mr. *Winder*, for the appellant and claimant, argued, (1.) that it was the settled rule of this Court not to interfere in a doubtful case of this description,[a] and that the evidence in the present case was too dubious to justify the Court in depriving the captors of the possession which they had acquired in war. (2.) That even supposing he was mistaken on this point, this was a capture by a lawfully commissioned cruizer of Buenos Ayres, the title under which had been confirmed by a regular condemnation in the Prize Court of Venezuela, an ally of Buenos Ayres in the war againt Spain. It may be stated as an universal proposition, which has never yet been doubted or denied, that a sentence of condemnation by a competent Court is conclusive, as to the proprietary interest in the *res capta*, and upon the mere question of prize or no prize : whatever doubts may have been suggested as to the collateral effect of such sentences. And a condemnation in the Court of an ally or co-belligerent is equally competent for this purpose with that of the captor's country itself.[b] This Court, as a neutral tribunal, is

a The Amistad de Rues, 5 *Wheat. Rep*. 385.

b *Wheat. on Capt*. 261. 2 *East's Rep*. 473. 2 *Bro. Civ. and Adm. Law*, 257. 281. " What has been said does not extend to ships *carried into the ports of an ally in the war, and there condemned*, or while the ship is there, condemned in the captor's country ; and, therefore, in the present war a sentence of

1822.

The
Arrogante
Barcelones.

therefore precluded from all inquiry into the previous circumstances under which the capture was made, and whether the capturing vessel had been armed and equipped in violation of our neutrality. There must be some limit to such inquiries, and there is none so fit as a regular sentence of condemnation, which, by the universal law and usage of nations, quiets the title acquired in war. And even if a decree of restitution, in the present case would not directly impugn the sentence, it would so far affect the general doctrine of conclusiveness as to disturb the safety of neutral purchasers.

Mr. *D. Hoffman*, contra, insisted, (1.) that there was no sufficient legal evidence of the existence of the condemnation set up in this case. We have a mere dry sentence of the Court of Juan Griego, contained in a few lines, stating that the property is Spanish, and condemned as legal prize. The character of the capturing vessel, by whom commanded, commissioned, or owned and equipped, the authority of the Court to adjudicate on the subject, the nature of the connexion (if any) between Venezuela and Buenos Ayres, or any power by whom the commission may have been granted, do not appear : every ground is withheld which could enlighten this Court, now virtually called upon

condemnation at Bayonne, of a ship taken by the French and carried into St. Sebastian, (22) and lying there at the time of the sentence, has been held valid ; and this decision agrees with Bynkershoek's opinion, *Qu. Jur. Pub. cap.* 4.

(22) 2 Robinson, p. 209, case of the Christopher.

to enforce this decree. In a case like the present, the Court will require the most satisfactory information that can be furnished. Where a case is free from suspicion and difficulty of any kind, and when the sentence itself, however concise, necessarily involves the point in discussion before another tribunal, it might be sufficient to produce the *sentence* as evidence of the condemnation relied on ; but the Court is pressed, on this occasion, with many necessary inquiries which do not usually occur. If the condemnation is to operate as a conclusive bar against the exercise of the restoring power of this Court, so essential to the maintenance of the laws, treaties, neutrality, and morals of the country, it has a right to be informed whether their violation was ever the subject of inquiry before the Court which pronounced the condemnation : it has a right to ascertain whether there was a commission, and by whom the commission was granted ; for if granted by an individual, or a people neither recognized as a sovereign state, nor as engaged in a civil war, the condemnation would, on these grounds alone, be wholly inoperative. In such a case the Court will require the entire prize proceedings to be exhibited ; but if not, then at least the libel, in addition to the sentence. Here is neither the libel nor an abstract of proof, and the sentence itself is uncommonly bald. The rule on this subject *formerly* was, that the *entire proceedings* should be set forth : now, however, if the libel and sentence are satisfactory, the Court dispenses with any thing further.[a] The libel, it would

---

a Mar. Ins. Co. v. Hodgson, 6 *Cranch,* 207. 220.

appear, is essential: In *Fernandis* v. *Da Casta,*[a] Lord Mansfield dispensed with the libel, only because the plaintiff had, by an unequivocal act of his own, made it unnecessary to be exhibited. So, also, in the case of *Beake* v. *Tyrrel,*[b] the necessity of furnishing the Court with the material grounds of the prize proceedings, is strongly urged by Lord Chief Justice HOLT. If we advert to the general principles of the common law on this subject, we shall find it an established principle, that wherever a record is relied on, *all that concerns the matter in question* must be produced. The authorities cited are pointed to this effect.[c] No case can well be imagined in which the necessity of showing the grounds and extent of the proceeding more strongly applies than in the present : for it does not appear that Almeida had any commission; and if this be the fact, no condemnation would avail, were it ever so well authenticated.[d]

2. But were the condemnation satisfactorily proved, it is contended that it was pronounced by a Court wholly incompetent to adjudicate on the case ; that the whole proceeding was *coram non judice ;* and that it appertains to all Courts to inquire into the *jurisdiction* of another Court, whose judgments or decrees are relied on. It is presumed that under the *jus gentium* an operative sentence of condemnation must be pronounced : either, *first,* by a Court of the

1822.

The Arrogante Barcelones.

a *Park on Ins.* 177. 178.

b *Comber.* 120.

c 3 *Inst.* 173. *Trial per Pais.* 166. 2 *Bac. Abr. Evid.* F. p. 611. 613.

d 2 *Bro. Civ. Law,* 55.

captor, sitting in the country of the captor; or, *second-ly*, by a Court of the captor, held in the country of an ally or co-belligerent of the captor; but that the Courts of the ally or co-belligerent are wholly incompetent to hold plea of captures made by any one but themselves. The question is entirely new; and it is believed to be so only because it was never before attempted by the Courts of an ally to pass sentence on captures made by their associates in war. That allies and co-belligerents can co-operate *judicially* as well as in a belligerent manner, is a position not to be found in the works or opinions of any writer. Condemnations in the *port* of an ally or co-belligerent are frequent; but no case can be produced of a condemnation in the *Court* of an ally. No elementary writer mentions this exercise of judicial power of an ally. Dr. *Brown*[a] has been evidently misapprehended by the appellant's counsel. That sensible, though hasty, and sometimes inaccurate writer, has not expressed himself, in the passages cited, as clearly as he might have done; but still he does not speak of the *Courts* of an ally condemning property taken by a companion in arms. He speaks of ships carried into the ports of an ally, and *there condemned*; but he does not state by *whom* condemned. It is, therefore, but justice to him to infer that he meant *a Court of the captors* established in the territory of the ally in the war; and that this, and nothing else, is his meaning, is obvious from the authorities which he cites. All the cases in support of the condemnation now in judgment, will be found, on examination, to be de-

a 2 *Bro. Civ. Law,* 215. 257. 281.

crees pronounced by Courts of the captors, sitting in the country of the ally or co-belligerent, and therefore confirmatory of our position. The very silence of the writers on the law of the admiralty as to this subject, and the absence of all judicial authority, argues the soundness of the doctrine contended for. The case of the *Harmony*[a] was a condemnation of a British vessel, by the French commissary of marine, sitting in the country of an ally in the war ; and the cases of the *Adelaide*, and the *Betsey Kruger*, were under similar circumstances. The *Cosmopolite*[b] presents a condemnation by the *French Consul*, in a Spanish port, Spain then being a co-belligerent with France ; and though the *res capta* was American property, the principle is the same. So likewise in the case of *Oddy v. Boville*,[c] mainly relied on by the appellant's counsel, we find the condemnation to have been pronounced by a *French Court*, sitting in Spain, then an ally of France, in a war against Great Britain. In fine, all the cases of condemnation in the country of a co-belligerent, are by courts of the captor sitting within the dominions of the ally. But it is not alone on the absence of authority, sanctioning prize proceedings in the courts of the ally, that the doctrine now contended for reposes. Every principle and analogy of the law on the subject are at variance with the exercise of such a power. The principles which introduced condemnation as an evidence of transmutation of property under the laws of war, in lieu of the doctrine of *deductio infra*

1822.

The
Arrogante
Barcelones.

a 2 *Rob. Adm. Rep.* 174. *note.*     b 3 *Rob.* 268.
c 2 *East's Rep.* 474.

1822.

The
Arrogante
Barcelones.

*præsidia*, pernoctation, &c. evince the impropriety of transferring the investigation *ad aliud examen*. A judicial inquiry into the regularity of prize proceedings is important to the world at large. The capturing nation has an interest in knowing that its prize ordinances are strictly adhered to, and the Courts of that nation are the most competent to inquire into this, and to enforce their observance. The nation of the captured belligerent has also some rights in respect to the things taken : as war is a contest by force to compel the party in the wrong to make retribution for some injury, the principals in the war have an account to settle, and they are reciprocally responsible for the justice and regularity of all hostile acts. No tribunals, therefore, but those of the capturing belligerent, ought to inquire into the validity of captures. Neutrals, likewise, are interested that the regularity and validity of seizures made from them should be passed on by the tribunals of that belligerent by whom the taking was effected. A contrary doctrine might deprive them of the benefit of that responsibility to which captors should ever be liable. If the ally passes sentence, it is probable the neutral would be referred to the capturing nation for any satisfaction the case of an illegal capture might demand ; and if application were then made to that nation, the neutral might be referred back to the ally who pronounced the sentence. In theory, therefore, and practice, there appears to be a moral fitness in the rule which would restrict the power of condemnation to the tribunals of that belligerent by whom the property has been actually taken. The *country*

then, of an ally, may be subservient to this purpose, but not the *Courts*, unless where the captures are made by the allies or co-belligerents themselves.

In addition to the objections to the mode of authenticating the condemnation, and the competency of the tribunal pronouncing it, may we not ask for some proof of an alliance or association in arms between Venezuela, the alleged ally, and the power, whatever that be, under which the claimant pretends to have acted? Even the sentence itself affords no light on this subject, and if it did, the proof should be by matter *aliunde*. As the condemnation is silent as to the power granting the commission, and no commission has been produced, this Court has no evidence that the condemnation was pronounced even by the *Court of an ally;* for the Court may justly infer that there was no commission, and if the inference be not made, but it should turn out that Almeida acted under an *Artigas* commission, the Court might then be of opinion that no alliance could be formed with the Banda Oriental, or its chieftain, Artigas, as none are capable of maintaining the relation of an ally who cannot be a sole belligerent. Hence, then, the necessity of proving the alliance, and thus furnishing an additional reason for requiring the production of something more than a naked sentence of condemnation.

4. But should all these objections prove unfounded, we then resort to the ground, that a condemnation by a Court of competent jurisdiction does not deprive this Court of the power it otherwise would possess of restoring this property, the exercise of this

power being essential to the maintenance of our laws and neutrality.

That this sentence is wholly inoperative, as respects he restoring power of this Court, appears to be manifest from a variety of considerations.

As the avowed object of this condemnation was to close the judicial eye, and paralize the judicial arm, of this tribunal, it will be proper to inquire into the object and extent of the prize proceeding in the Vice Admiralty of Juan Griego, and the jurisdiction and power now required to be exercised by this Court. We contend, *first*, that this Court, in vindication of the violated laws of the land, will, if necessary, wholly disregard this condemnation ; but, *secondly*, that restitution may be decreed without impugning, in any degree, the operation of this sentence, or the general doctrine of the conclusiveness of admiralty decrees. This is not a *petitory* but a *possessory* suit. The *title* to the property is no way involved in this proceeding. There is but one inquiry : Has the claimant acquired the *possession* of this property by means unlawful, as regards this country ? if so, that possession will be restored to those from whom it has been wrested by the instrumentality of our citizens. The possession will be placed *in statu quo*, without any reference to the title which may otherwise have been acquired by the capture and condemnation. If this can hereafter avail the claimant any thing, it is well ; this Court only claims the power of undoing that which has been done in breach of the laws, and only so far as to place both

parties, in regard to the possession, in their former condition.

Were the Court deprived of this wholesome power, our citizens and foreigners might violate our laws and most solemn treaties with complete effect. The fruits of their illegal captures, though brought here, and in the control of our tribunals, might be at once snatched from it by the production of a condemnation decreed by the very power, and in favour of the very persons, by whom our laws have been infracted. If, during this investigation, the captors, by the pretended necessity of sending a commission abroad, should procrastinate the adjudication, sufficient time would be gained for the production of a well concocted condemnation, which would never fail to make its appearance in due time; and thus the violators of our laws would uniformly be confirmed in the possession of the fruits of their own wrong.

In the case of the *Anne*[a] it was decided by this Court, that a capture made within neutral territory, is nevertheless valid, as between the belligerents, though it be a nullity as respects the neutral whose territory has been violated. If England, then, and France be at war, and an English privateer captures a French vessel, in the port of Philadelphia, and forthwith proceeds with the prize to sea, carries her *infra præsidia capientium*, where she is condemned, and is then brought back to the port of Philadelphia; what would probably be the lan-

*a 3 Wheat. Rep.-435.*

1822.

The
Arrogante
Barcelones.

guage of this Court, when about to restore the prize, if a condemnation were presented with a view of closing all inquiry as to the violation of our territory? We apprehend it would be to this effect. In regard to France, your *enemy*, the capture is rightful; your condemnation pronounces it such; but in the present inquiry a *third* party is interested. Your possession of this vessel was gained by an abuse of our asylum, and an infraction of our territorial jurisdiction: as we have now the possession of the *corpus*, we restore it to those from whom you have, as to this country, illegally taken it. If such would be the language of this Court, in the case of a gross violation of our territory, I apprehend the same reply will be given to Almeida, who has not only violated all the laws enacted for the preservation of our neutrality, but has, also, grossly abused the asylum accorded to the privateers of the South American provinces. If these vessels, in the use of that asylum, completely equip themselves with our arms, ammunition, and men, and all is to be rendered valid, or at least inscrutable, by a formal condemnation, all legislation on the subject of neutrality is but public and solemn mockery.

If this condemnation be a conclusive bar against all inquiry as to the violation of our laws, the competency of the power granting the commission, the competency of the person receiving the commission, &c. it is manifest that Venezuela, Buenos Ayres, or any of these new formed sovereignties, may compel

us, through the instrumentality of a condemnation, to accord to them the rights of sovereignty to every extent.    In such case, captures made under the commission of Aury, or Artigas, would be equally operative with those granted by powers acknowledged to be independent, or engaged in a civil war, and the doctrine of *Rose* v. *Himely*, and the distinction taken in *Palmer's case*, and that of the *Estrella*, would be of no avail.    Nay, even in the case of seizures clearly piratical, the 6th and 14th articles of our treaty with Spain would be effectually annulled.

Again ; all inquiry into the *fact* of the violation of our laws, and its civil as well as penal consequences, belongs exclusively to the tribunals of this country. The Courts of other nations have no right to pronounce a binding judgment as to the validity or invalidity of any act against our civil, political, or criminal laws: the right to vindicate our own laws is essential and inherent : it is a sovereign right, which we have not parted with to the tribunals of other nations. If the decrees or judgments of those tribunals come in collision with our laws, the Courts of this country must pursue their even way, and enforce those laws, without any reference either to the laws or judgments of foreign state.    Passive obedience to the decisions of foreign tribunals has been sufficiently inculcated ; but no attempt has ever been made of so exceptionable a character as this: to require this Court not only to yield to the demands of foreign violators of our laws and sovereignty, but also to the insolent requisitions of our own criminal citizens.

*a* 2 *Azuni*, 252.    1 *H. Bl.* 123.    2 *H. Bl.* 410.

To give force to this condemnation, is, in fact, to call on this Court to enforce the decree of a foreign Court. A Court, thus called on, always claims the privilege of examining into the jurisdiction of the Court pronouncing the decree, the regularity of its judicial proceedings, and the *intended* extent of its operation.

It cannot be denied, that if a privateer, or even a public vessel of war, of a foreign power, be fitted out in our ports, her commission can protect neither her nor her prizes from the sanctions of our law. Why then should a *condemnation*, which is but the exercise of another species of sovereign power, place the property in a state of absolute immunity? The position taken on the other side, that decrees of a Court of competent jurisdiction are *always* binding, and exclude *all* inquiry, is far from sound. The general doctrine is well known, but its extent and its exceptions are equally well known.

Secondly: But this Court may decree restitution, without in any degree impugning the doctrine of the conclusiveness of admiralty sentences.

If the postulate be allowed, that the restoring power of this Court rest exclusively on the ground of violated neutrality, then the prize Court had no right to, and never did, in fact, institute any inquiry relative to the illegality of the equipment, in reference to our laws; that is an inquiry competent for this Court solely. There is another inquiry, competent solely for the Courts of the captors, viz. the fact of the capture, and its conformity to prize regulations and the *jus belli.* These are distinct rights, in the exercise of

which neither tribunal is called on to pronounce on any matter not essential to be proved in order to justify a decision. The taking was rightful, in regard to the belligerents, though our laws were violated, and its restitution by this tribunal will be equally so, though the seizure be valid *qua* prize. In this point of view, there is no collision between the two tribunals; the decree of each stands, *valeat quantum valere potest.* No judgment or decree establishes any thing beyond what was necessarily proved in order to arrive at the decision. The sentence, at most, proves nothing but its own correctness in regard to the mere question of prize.[a] All the cases, where condemnations are relied on, have a qualification to this extent. The sentence in this case pronounces that the property was Spanish, and is condemned as good prize. It does not state, either affirmatively or negatively, one word about the equipment of the privateer; and it cannot, therefore, be even *prima facie* evidence that the privateer had proceeded legally in regard to the whole world. Where a vessel is captured by a belligerent, for unneutral conduct, a condemnation would be conclusive; she was condemned on this sole ground, and she could not be restored by the Courts of the neutral nation, without falsifying the very fact on which the capture and condemnation proceeded. But here the possession will be restored to the Spanish owners, not *qua* prize, but simply on the ground that the use of our neutral means in making the

1822.

The
Arrogante
Barcelones.

a Maley v. Shattuck, 3 *Cranch* 458. 488. The Mary, 9 *Cranch.* 126. 142. 1 *Campb. N. P. Cas.* 419. 12 *Mass. Rep.* 291 2 *Bro. Civ. and Adm. Law,* 121.

capture, was a matter in which the prize Court of Juan Griego had no concern.

As a capture in violation of neutral territory is still valid, in regard to the contending parties, the capture, in a belligerent Court, would be *omni exceptione major*. Spain, in the present case, would in vain have set up the violation of our laws as a defence, and the United States had no *persona standi in judicio*. A suggestion of violated neutrality, on behalf of this country, would not have been regarded.

Adverting, for a moment, to the grounds on which the doctrine of conclusiveness is said to rest, we shall find that none of them would be impeached by the the restoration of this property. They are said to be three : comity, notice to all the world, and the co-equality of nations. As to the doctrine of comity, it is founded on the supposition of the utmost good faith, and there must be a perfect reciprocity in order to support it. Is it not too much to require of any nation, on the ground of comity, to permit foreign powers to confederate with the worst class of our people, in insulting and trampling on our solemn treaties, neutral obligations, and explicit laws of public policy ?

But it is supposed to be a second ground of this doctrine of conclusiveness, that the whole world have notice, and are parties to the proceedings in a prize Court, they being *in rem*. This, if true in fact, only applies to those who have a title or interest in the *res ipsa*, and not to those who have such a collateral, incidental, or potential right as that of the United

States. But the notice is itself a mere fiction.[a] The United States had no *persona standi* in that Court ; and if they had, it would have been impossible to assert it, as the libel, condemnation, sale, and arrival of the prize in this country, were nearly cotemporaneous. It is the nature of fictions to work justice, not palpable injustice : this Court, therefore, will not suffer itself to be ousted of its rights by a forced application of such a fiction.

The last ground on which condemnations have acquired their power, is the admitted co-equality of all nations. This, perhaps, is the true principle. Admitting that the recognized competency to wage a civil war would clothe these provinces with every attribute of sovereignty, the reply is, that the Courts of no nation are competent to render this condemnation binding to the extent contended for : this would be at war with the very principle ; we should become *inferior*. The *deductio infra præsidia* does not clothe this Court with any power ; its jurisdiction originates in its right to maintain our neutral duties, and extends only so far as is required for that maintenance ; no power on earth can deprive us of this right. If the sentence of any Court be extended thus far, we may say, with Lord KENYON, " it may be throwing a veil over decisions founded on Algerine, or worse than Algerine principles ; and if such sentences are to protect their own injustice, redress would be sought in vain :" and it may be added, that the rights of this country, and those of the

*a* 3 *Dall.* 91.   9 *Cranch,* 144.

1822.

The
Arrogante
Barcelones.

most vital nature, would be prostrated without reme-dy. If, then, the prize Court of Venezuela have pow-ers co-ordinate with this, we should not, however, by asking restoration, impute to this condemnation a legal infirmity, but to the capture a vice antecedent and paramount to the decree, and not cognizable by that tribunal.

Were the doctrine of conclusiveness permitted to rest on its original principles, we should not be in-clined to quarrel with it ; but where it is extended beyond its known and salutary operation, we cannot regard it but with a jealous eye. If it be invoked by a purchaser under the decree, or to falsify a war-ranty of neutrality, there are then special reasons of policy, convenience, and comity, which sustain it. These special grounds are satisfactorily explained in the case of *Croudson* v. *Leonard ;*[a] but it will be seen that none of the three grounds there set forth would be impugned by a restitution of this proper-ty : for *first*, the question of prize is not before this Court ; *secondly*, the present inquiry is not in a com-mon law court, but before a tribunal of the law of na-tions, and every way competent to make the necessa-ry investigation ; and *thirdly*, the decision of a Court of co-ordinate jurisdiction is not re-examined.

But it has been urged, that a restitution of this property to the Spanish owner, though it might not directly impugn the condemnation, would be so far opening admiralty decrees as to disturb the safety of neutral purchasers generally, and that this would be contrary to the policy of nations. The answer to this

*a* 4 *Cranch*, 434.

is, that the purchaser under the decree of any Court does not necessarily obtain an unimpeachable title. He must take the property *cum onere*; the paramount vices in the title remain; he does not purchase under a general, but under a special warranty. The title gained by the capture, remains; it was illegal in its origin, and, as to the offended power, can never be rehabilitated.[a]

5. Lastly, the proof in the present case is positive that this vessel and cargo were captured by the claimant, for himself and his associates. The condemnation enures to his benefit; the alleged purchase by him was nominal; and, if it were otherwise, he gained his title or possesion by a wrong, and no act of his can purge the wrong. Here we may apply the rule of the civilians: *that no one can change the cause of his own possession.* On this principle is it, in part, that executors, guardians, and all who stand in the relation of trustees, are, (as a general rule,) incompetent to purchase the trust estate. Almeida's possession was gained by a wrong; he cannot change the character of that possession; he cannot, by his own act, give himself a better title. A defective title may indeed be rendered good by the purchase of outstanding good titles; but here is no outstanding interest in the subject matter, but in the United States. The condemnation then could only corroborate the title which he had gained, and could not clothe him with a better one.

Mr. *Harper* also argued on the same side; but

a Moodie v. The Betty Cathcart, *Bee's Rep.* 299

as the whole of his argument upon the conclusiveness of the foreign sentence will be found reported at large, in the next volume, in the case of the *Nereyda*, in order to avoid a repetition, it is thought expedient to refer the reader to that case, which involved the same question.

Mr. *Winder*, in reply, denied the authority of the supposed rule that a decree of sentence or a Court of Admiralty cannot be given in evidence, without producing the libel, or other proceedings. There can be no necessity for producing the libel, if the sentence itself shows what the libel would show : and in this case the decree sets forth every fact which would appear on the face of the libel, or which is material to establish the conclusiveness of the proceedings. The decree accompanies the possession of the vessel, the essential muniment of her title. This Court has never asserted a right to look beyond the sentence of condemnation. It has always admitted its conclusiveness, even as to collateral effects. But even if the sentence be conclusive as to the question of prize only, the right of the original owner is completely devested. And even admitting this to be a possessory action, yet the right of possession depends on the right of property, otherwise any stranger might claim. As to the competency of the tribunal ; the fact of the connection between the different Spanish provinces in the present war is notorious, and Courts of justice will always take notice of such facts. Indeed, the President, in his different official communications to Congress, has alluded to their being en-

gaged in a common contest against the mother coun-
try. Why then should they not lend each other the
aid of their tribunals to pronounce condemnations, as
well as of their ports to fit out the armaments with
which the captures of Spanish property are made?
If, according to the original practice of nations, a
carrying *infra præsidia* were to consummate the title,
would it not be sufficient to carry the prize within
the territory of an ally, or co-belligerent ? If one co-
belligerent can consent to a foreign tribunal sitting
within its territory, and condemning prizes made by
the cruizers of its ally, why may not the ally permit
its captures to be adjudged in the Courts of its co-
belligerent? But at all events, Venezuela was her-
self engaged in war against Spain, and this was the
property of her enemy brought into her territory. She
had a right to condemn it in her Courts, and did con-
demn it so as to make it a part of the mass of nation-
al property. There is no positive authority which
denies the authority of the Courts of a belligerent, to
condemn prizes captured by its co-belligerent ; and
in the absence of any case to the contrary, it is suffi-
cient that no reason of principle or public policy ex-
ists to prevent it. The learned counsel also refer-
red to the Resolution of Congress during the revolu-
tionary war, authorizing their Courts to condemn
prizes captured by French cruizers, to show that the
opinion and practice of nations had authorized simi-
lar proceedings.[a]

1822.

The
Arrogante
B arcelones.

a 5 *Wheat. Rep. Appx.* 123.

Mr. Justice JOHNSON delivered the opinion of the Court.

The offence proved upon Almeida in this case is one of a very aggravated nature. He not only violated the neutrality of this government, but effected his purpose, by practising a flagrant fraud, either upon his crew, or upon the revenue officers of the port of Baltimore; or perhaps partially upon both. Every thing in the case proves that the sealing voyage round Cape Horn was a mere pretext; and if it be true that the crew were kidnapped under that pretext, and forced into belligerent service after getting to sea, it is a remarkable instance of bold and successful imposition. But who can believe it? The truth unquestionably is, that the crew, with perhaps the exception of the few who were put in irons, understood perfectly the nature of the enterprize they were embarking in, and were deceived into the belief that their affected ignorance, or the impudence of the fraud, would screen them from the penalties of the laws which forbade their entering into belligerent service.

It cannot, then, be questioned that Almeida now appears before us in the character of a flagrant offender against the laws and neutral obligations of this country. And there is no shadow of a ground for hesitating to apply to this case the established rule of this Court, in cases of illegal outfit, unless it be the condemnation of this vessel and cargo in the Court of Margaritta.

This Court will, for the present, waive all expression of its opinion on the questions raised upon the validity of that condemnation, or the sufficiency of the

document produced to prove it. We will put our decision upon a single, and independent ground, that the view of this Court, with regard to all such cases, may henceforth be distinctly understood.

We find the captured property in the hands of the offender, and hold it to be immaterial through what circuity of changes it has come back to him. It is not for him to claim a right springing out of his own wrong. In the hands of a third person, a valid sentence of condemnation, properly authenticated, would present a very different view of the subject. The offender's touch here restores the taint from which the condemnation may have purified the prize. Although a purchaser without notice, may, in many cases, hold his purchase free from an interest with which it was chargeable in the hands of the vendor, yet it cannot return into the hands of that vendor, without reviving the original heir. Nor will Courts of justice ever yield the *locus standi in judicio* to the suitor, who is compelled to trace his title through his own criminal acts.[a]

Decree affirmed.

a In the case of the *Nereyda,* which was argued at the present term, the Court was of opinion, that in cases where a condemnation is relied on, the libel as well as the sentence ought to be produced, in order that the Court might judicially see that the foreign tribunal had jurisdiction, and what was the ground of application for condemnation, and the parties by whom it was sought. The Court also thought that the claimant ought to show by competent evidence that he was a *bonâ fide* purchaser of the property for a valuable consideration ; and from the defects of the proofs on both points, the cause was ordered to farther proof. It has therefore been thought fit to omit a re port of the case, until its final decision.