Casey, C. J.,
delivered tlie opinion of tlie Court.
The claimant sets forth in his petition that, on the 20 th February, 1S15, he was a captain in the navy of the United States, and was in command of the United States frigate “ Constitution.” That on that day he overtook, on the high seas, about sixty leagues from the island of Madeira, the British ships-of-war Cyaue and Levant, and engaged them; and, after a sharp conflict of forty minutes, they surrendered to him, and he took possession of them as prizes of war. He proceeded with them and his own ship to the island of St. lago, in the possession of the troops, and subject to the dominion of the prince regent of Portugal, with whom the United States were then at peace, and who had issued á declaration of neutrality between the belligerents — the United States and Great Britain.
Having come to anchor in the port of Praya, on the 10th of March, 1815, and while he was preparing to divest himself of the prisoners taken on the Oyane and Levant, by sending them to Barbadoes, he discovered on the following day, off the port, a squadron consisting of three British ships-of-war, the Leander, New Castle, and Acasta ; hut which, in consequence of the prevalence of a dense fog, were not discovered until within three miles, and standing- in for the anchorage. Being apprehensive that the enemy would not respect the immunity afforded by a neutral port, Captain Stewart put to sea with the Constitution and his prizes, and the squadron immediately gave chase. After aboirt ail hour’s chase, finding the Cyane sailing dull and dropping down on the Acasta,he signalled her to tack, which she immediately did, doubled the rear of the enemy, and afterwards arrived safely at is ew York. The enemy took no notice of the Cyanc’s change *114 of course, but continued the pursuit of the Constitution and Levant. Soon after he discovered the Levant dropping down in the same way that the Cyane had done, and he ordered her also to tack, which she did. The enemy continued the chase after her, cut off her retreat, and forced her back into the port of Praya, whore she came to anchor close to the battery. She was in this position when the enemy’s ships stood in, fired at her, and forced her to surrender, took possession of her and carried her out of the harbor, without the Portuguese authorities attempting to hinder or prevent them, or offering any resistance or remonstrance to the violation of the neutral rights and sovereignty of Portugal.
The claimant further alleges that the United States had a clear and undoubted claim upon the Portuguese government, for allowing hostilities to be carried on and recapture of the ship made within her neutral territory; that the claim of the claimant and his crew was recognized by Mr. Crowninshield, Secretary of the Navy, in a letter addressed to the claimant on the 13th June, 1816.
Ho further avers, that in the years 1850 and 1853 he called the attention of the Secretary of State of the United States to the case, and that the replies assured him that the matter should receive the attention and consideration which its importance demanded.
The petition also alleges that claimant memorialized Congress on the same subject, and that the Naval Committee of the House of Representatives, in 1816, reported against the payment of the whole value of the Levant to the officers and crew of the ship Constitution, but recommended the passage of an act giving them the sum of twenty-five thousand dollars, which should be deducted from the whole value, if the United States recovered it from Portugal. The valuéis alleged to have been one hundred thousand dollars. The act passed by Congress is in the following words :
AN ACT rewarding tlie officers and crew of the Constitution for the capture of the British sloop-of-war Levant.
“ Be vt enacted,” &c., “ That the President of the United States be, and hereby is, authorized to have distributed as prize money, to Captain Charles Stewart, late of the frigate Constitution, his officers and crew, the sum of twenty-five thousand dollars, for the capture of the British sloop-of-war Levant; and that the sum of twenty-five thousand dollars, out of any money in the treasury not otherwise appropriated, be and the same is hereby appropriated for the purpose aforesaid.”
*115 This act was approved 26th April, 1816, (3 Stat., 301,) and the money was paid according to its provisions.
The petition also avers that he'and those for whom he claims are citizens of the United States, and can have no redress against the Portuguese government, from whom the indemnity is due ; that it was and is the duty of the United States to prosecute and enforce the claim, on their behalf, against Portugal, and on the recovery of the amount to distribute the same to him, his officers and crew; that there was a convention between the two governments in 1851 for the adjustment of the claims of citizens of the United States against Portugal, in which this claim was not included, and that by having relinquished the claim without the authority or consent of claimants, or failed to prosecute and enforce it, the United States became liable to pay it themselves.
The 5th and 6th sections of the act of Congress approved 23d April, 1800, (1 Stat.,) in force at the time of the capture of these vessels, gave the captors the whole of the captured vessels, where they were superior in force to the vessel making the capture. The Cyane was libelled in the admiralty court at New York and duly condemned as good and lawful-prize to the captors. The claimant contends that by the capture of the Levant the prize vested in him and his crew ; that the recapture under the circumstances alleged was illegal, and that Portugal was liable to the United States, and they to the claimants, for the value of the prize.
To this petition the solicitor for the United States has demurred, and assigns for cause of demurrer — •
1st. That the petition sets forth no valid ground of claim.
2d. That it does not appear that the United States had released Portugal, or relinquished any claim the plaintiffs have upon her for indemnity.
There can be but little doubt that the facts set forth in the petition— and on this demurrer they must be taken as true — show that the officer in command of the British squadron was guilty of a violation of the neutral rights of Portugal in making her territory the scene of conflict with and capture of this vessel. For such an insult to her sovereignty and invasion of her just rights as a neutral, she had just grounds under the law of nations to claim indemnity and reparation from Great Britain. It is equally clear, we think, that the United States had the right to insist upon indemnity from Portugal for this invasion of her right of asylum in a neutral port.
*116 Hostilities began or continued in a neutral territory must violate the rights of sovereignty of the neutral power, and therefore the law of nations forbids the belligerent power to begin or continue hostilities in the territory or ports under the dominion of the neutral sovereign. (Marten’s Law of Nations, Book 6, chap. 6, § 6.)
For this reason, when two vessels the enemies of each other meet in a neutral port, or one pursues the other into such port, not only must they refrain from all hostilities while they remain there, but should one set sail, the other must not sail in less than twenty-four hours after-wards. (Moser’s G-rundlehren, chap. 21, § 25, p. 269.)
And because foreigners can do nothing in a territory against the will of the sovereign, it is unlawful to attack an enemy in a neutral country, or commit in it any other act of hostility. The Dutch East India fleet having put into Bergen, in Norway, in 1666, to avoid the English, the British admiral bad tbe temerity to attack them there. The governor of the town fired upon the assailants, and the Danish government made it a subject of grave complaint, as being in violation of her neutrality and injurious to her honor and dignity as an independent and neutral sovereignty. (Vat., Book III, chap. VII, § 132.)
Belligerent powers must be exercised within the belligerent territory, on the high seas or on territory belonging to no one ; and all hostilities exercised within the territorial jurisdiction of the neutral power are unlawful, and are strictly prohibited by the law of nations. (Wheat. L. of Nat., p. 713-14.) It follows that all captures made within such neutral territory are absolutely void. (Ibid., 715.) Bynkershoek indeed mentions an exception to this rule in the case of a hostile vessel met at sea, which he says may in the pursuit be chased into the neutral territory ; but he is not sustained by any writer of authority or by the adjudications of the prize courts. “ When the capture within the neutral territory is established,” says Sir William Scott, “ it overrules every other consideration — the capture is done away; the property must be restored, notwithstanding it may actually belong to the enemy.” (The Vrow Anna Catharina, 5 Rob., 15 ; Wheat. Law of Nations, p. 722.)
So far has this doctrine been carried, that it is held to be a violation of the rights of sovereignty of the neutral to issue a belligerent commission within a neutral country or to equip and fit out cruisers in such country, or to augment the force of a belligerent ship in a neutral port. In all these, and the like cases, if captures are subsequently made on *117 the belligerent territory, or the high, seas, and the prizes are brought into a port of such neutral country, restitution will be decreed and enforced by the tribunals of the country whose neutrality has been violated. (Talbot vs. Jansen, 3 Dall., 133; The Alesta, 9 Cranch, 359; The Estrella, 4 Wheat., 298; The Arragonte Barcelones, 7 Wheat., 496; La Conception, 6 Wheat., 235; The Santa Maria, 7 Wheat., 490; The Santissima Trinidad, 7 Wheat., 283; Abbot on Shipping, p. 34, in note; The Anna, 5 Rob., 373.)
These authorities, and many others that might be cited, show very clearly that the acts and proceedings of the British officer in command of the squadron were unlawful, and the recapture of the Levant, under the circumstances and in the place it occurred, a high-handed and unjustifiable proceeding. But Portugal alone had a right to complain of his conduct to the government ho represented, and in whose behalf he committed the act. The claimant, through the government of the United States, whose flag he carried, could only complain to Portugal of her conduct in failing, through weakness, timidity, or favor to our enemy, to maintain her neutrality, and secure to our citizens the protection they had a right to expect from a neutral sovereign within his territory.
So far as the case before us develops the facts, it does not appear that Portugal ever obtained from Great Britain any reparation or indemnity for this act, and it is certain that the United States received none from Portugal. Whether the claimants can maintain this suit against the United States will depend upon whether the claimants had such a right in the captured ship as required the United States to prosecute and enforce it against Portugal. And also whether, if the United States released or relinquished the claim on considerations of public policy, they became liable for the amount to the claimants.
The argument on behalf of the claimants assumes that the captors had a right and title to the captured ship, and of which they were illegally divested or deprived.
There is no doubt if this vessel had reached a port of the United States she would have been condemned as a good prize to the claimants ; for the Cyaue, taken in the same engagement and at the same time, was actually so condemned. The title to property lawfully taken in war may, upon general principles, be considered as immediately divested out of the original owner and transferred to the captor. As to personal property, it is considered as lost to the owner as soon as the enemy has acquired a firm possession, which is in general consid *118 ered as taking place after the lapse of twenty-four hours, or after the booty has been carried into a place of safety, infra prcesidia. (Grotius, Lib. Ill, cap. 6, § 3; cap. 9, § 14; Kliiber Droit des Gens. Moderne de 1’ Europe, § 254; Vattel, h. 3, ch. 14, § 196 ; eh. 14, § 209; Hoefter das Europaisclie Volkerrecht, § 136.)
It is upon authorities like the foregoing that the right and title of the claimants in the present case is predicated. But these general expressions refer to the time when the title of the original owner is divested rather than when the right of the individuals making the capture vests. Attention for a moment to the foundation and origin of the right of the individual to the captured property will assist us in the solution of this question. That right is acquired not in virtue of the seizure of it as enemies’ property, but by grant of the sovereign whose commission the captor bears. Judge Story says: “ It is now clear that all captures 'in war inure to the sovereign, and can become private property only by his grant.” The Emulous, 1 Gall, 569; 11 East., 619.)
The right to all captures from the earliest times has vested primarily in the sovereign, and no individual can have any interest in a prize, whether made by a public or private armed vessel, except that which he receives from the bounty of the State. (Law of Maritime Warfare, p. 374; Valin, Com. II, 235; BynK., cap. 17; Sir L. Jenkins’s Work, p. 714.) An interest in a prize can only be derived from the government. (1 Phillips on Insurance, 182, § 320; The Joseph, 1 Gall., 55S ; 11 East., 428.) It is even denied that the individual captors, prior to condemnation, have any insurable interest in the captured property. (Routh v. Thompson, 11 East., 432: Devause v. Steele, 6 Bingh. N. C., 370; Lucena v. Crawford, 3 B. & P., 75; 5 ibid., 323; Crawford v. Hunter, 8 T. Rep., 13.)
The principle applicable to this case to be extracted from the authorities cited is, that by the capture of this ship the property to it vested in the United States, and whatever right to or title in it the claimants acquired must be derived from their sovereign authority. Such a grant is set up under the act of Congress approved the 23d April, 1800, § 5, which is as follows:
“The proceeds of all ships and vessels, and the goods taken on board of them, which shall be adjudged, good prize, shall, when of equal or superior force to the vessel or vessels making the capture, be the sole property of the captors; and when of inferior force, shall be divided equally between the United States and the officers and men making the capture.” (Bright. Dig., p. 665, pl. 78.)
*119 The property of the original owner cannot ho considered as fully divested until there has been a condemnation by a regular prize tribunal having jurisdiction of the subject-matter. Until such adjudication is made, the right of recapture continues, as well as the right of postliminii. And in case the captured vessel escapes, is recaptured, or is voluntarily discharged, the jurisdiction of the prize court is lost, and all rights acquired by the capture are divested. (1 Kent's Com., 359.) The Supreme Court of the United States say: “The right of capture is a limited right, is derived from the law, and is subject to all the restrictions the law imposes, and is to be exercised in the manner in which its wisdom has prescribed.” (The Thomas Gibbons, 8 Cranch, 421.)
The question of prize may always he contested, either on account of the character of the vessel or cargo, the conduct of the captors, or the place and circumstances where and under which the capture was made; and until their right is established by the sentence of a competent tribunal, the captors are not invested with the property. (Vincen’s Exposition raisonnée de la Legislation Commercialc, chap. 17.)
A citizen may seize the property of an enemy wherever found, and it rests with the sovereign whether he will ratify and consummate the capture by proceeding to condemnation. (Per Story, J., The Emulous, 1 Gall., 566.)
These authorities are very full and conclusive that this capture, ■whatever right it conferred or property it changed, was in favor of the United States. It remains to inquire what property or interest the individual captors acquired by the surrender of the ship and her conveyance to this neutral port. The claimants contend that under the act cited they were once, invested with the right to the vessel, that it operated as an immediate transfer of the right of the United States to them. Such a position is assumed, we think; without due attention to the form of the grant and the eharactor of the grantor. It being the grant of a sovereign, it is contrary to the general rule to be taken most strongly against the grantee and in favor of the grantor. It can only take effect when its stipulations, limitations, and conditions have been complied with. The act prescribes that those vessels or cargoes ‘'■which shall be adjudged good prize ” shall be the property of the captors. This of course, upon the rule we have stated, excludes all such as have not been adjudged good prize; for expressio unius, est ex-clusio alterius. The title depends upon a grant, and must conform to it and comply with its conditions. The condition in this case is, that *120 it shall be brought in and condemned as lawful prize before any title accrues. Chief Justice Taney says: “All captures jure belli are for the benefit of the sovereign under whose’ authority they are made; and the validity of the seizure, and the question of prize or no prize, can be determined in his own courts only upon which he has conferred jurisdiction to try the question.” (Jecker v. Montgomery, 13 How., 515.) To the same effect is the judgment and opinion of Sir William Scott. That eminent admiralty judge says: “All grants of the sovereign are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives, rights, and emoluments of the sovereign being conferred upon him for great purposes and for public use, it shall not be intended that such prerogatives, rights, and emoluments are diminished by any grant beyond what such grant by necessary and unavoidable construction shall take away.” (The Rebekah, 1 C. Rob., 230.)
The case which bears most strongly on the question in hand is the judgment of the same great jurist, in the case of the Elsebe, 5 Rob., 173. In that case there was a capture of a vessel jure belli. She was brought into an English port and libelled, but before adjudication, on the application of the diplomatic representative of the nation whoso citizens were principally interested, the executive government of Great Britain directed the lords of the admiralty to release the ship and hand her over to the original owners. The case arose on a motion in the high court of admiralty to proceed to adjudication upon the rights of the captors, notwithstanding the release and discharge of the ship. The grounds taken on the part of the libellants were that the Crown had not the right to release; because such a right and interest had vested in the captors at the time of seizure, under the grant of prize, &c., as to entitle them to proceed to adjudication, notwithstanding an order of release on the part of the government. In delivering the opinion, that great judge says: “It is admitted on the part of the captors that their claim rests wholly on the order of council, the proclamation, and the prize act. It is not (as it cannot be) denied that, independent of these instruments, the whole subject-matter is in the Crown, as well in point of interest as in point of authority. Prize is altogether a creature of the Crown.
“No man has or can have any interest but what he takes as the mere gift of the Crown. Beyond the extent of that gift he has nothing. This is the principle of law on the subject, and founded on the wisest reasons. The right of making war and peace is exclusively in *121 the Crown. The acquisitions of war belong to the Crown; and the disposal of these acquisitions may be of the utmost importance for the purposes both of war and peace. This is no peculiar doctrine of our constitution; it is universally received as a necessary principle of public jurisprudence by all writers on the subject, hello parta cedunt reipuMicae. It is not to be supposed that this wise attribute of sovereignty is conferred without reason; it is given for the purpose assigned, that the power to whom it belongs to decide on peace or war-may use it in the most beneficial manner for the purposes of both.
“ A general presumption arising from these considerations is, that government does not mean to divest itself of this universal attribute of sovereignty, conferred for such purposes, unless it is so clearly and unequivocally expressed. In conjunction with this universal presumption must be taken also the wise policy of our own peculiar law, which interprets the grants of the Crown, in this respect, by other rules than those which are applied in the construction of the grants of individuals. Against an individual it is presumed that he meant to convey a benefit with the utmost liberality that his words will bear. It is indifferent to the public in which person an interest remains, whether in the grantor or the taker. With regard to the grant of the sovereign it is far otherwise. It is not held by the sovereign himself as private property; and no alienation shall be presumed except that which is clearly and indisputably expressed.”
Having shown that all prizes vest in the Crown — that the right of the captors rests only on the gift of the Crown, in the order in council, the proclamation, and the prize acts — he proceeds to show that it was merely a right to seize and bring in for adjudication a certain description of property, and that the interest of the captors in the prizes only vested when condemnation took place, and that prior to such time the sovereign could dispose of them as he saw proper, without impinging upon the vested rights of the people.
If these principles are sound, and we think they are sustained by the strongest reasons and the highest authorities, it must follow that this suit cannot be maintained by this claimant, for want of title to and interest in the subject-matter in respect of which the claim is made.
By the seizure of the ships they acquired a right to carry them into a port of this country for adjudication It is the condemnation under the act which gives the interest, and not the seizure. The capture vests it in the United States — the condemnation in the captors. It follows, as a necessary consequence from this, that there never having been a condemnation by a competent tribunal, there never has been *122 any legal right vested in the claimants. Nor could there he any such, for it required the judgment of a competent prize tribunal to vest that right in them under the act of Congress. No other court is competent to supply the want of it, because that is an essential condition of the grant, and cannot be supplied by anything else. What follows then ? Simply this, that when the Levant was permitted to be unlawfully recaptured by the Portuguese government, in violation of the rights of hospitality, as well as her neutrality, the sole right to and interest in the captured prize was in the United States alone. The injury was committed against her rights; and whether she should demand reparation in any form or to any extent, was a matter to be dictated and controlled by considerations of public interest and policy alone, and not .by any considerations of private interest or grievance, for none existed.
Mr. William Halsted for the claimant.
Mr. John J. Weed, Assistant. Solicitor, for the government.
The case of the brig Armstrong, decided by a majority of this court some years ago, has been pressed upon our attention as ruling this case. We do not think so. The question upon which this case is ruled did not and could not arise in that case. There was no question of prize in that cause. It was the destruction of a ship owned by private individuals. I may, however, be permitted to say for myself, that the very able opinion delivered by Judge Gilchrist has failed to satisfy me of the soundness of the conclusion reached in that case.
Congress appears to have taken much the same view of the questions involved that we do now when they passed the act giving the claimants the sum of twenty-five thousand dollars for the capture of the Levant. That the capture was an act of great merit and heroism is universally admitted. And we confess it would have afforded us sincere gratification if the law and the facts of this case had permitted us to convey a more substantial acknowledgment of the great services rendered by the venerable and illustrious commander of the Constitution and his gallant crew, who have contributed so much to make our flag respected on the seas, and to the lasting renown of our country. But we are restrained and guided by the law of the case, leaving all other considerations for that department of the government to which they appropriately belong.
We, therefore, are compelled to sustain the demurrer and dismiss the petition.