Milligan, J.,
delivered tbe opinion of tbe court:
This action was brought to recover tbe proceeds of the sale of two hundred and sixty bales of cotton stored in tbe city of Mobile, and alleged to have been captured by tbe United States military authorities in April, 1865. In tbe argument of tbe case no serious question was made on tbe loyalty of tbe plaintiff, or tbe capture and sale of tbe cotton claimed in tbe petition. Tbe defense was chiefly rested on tbe claimant’s title to tbe cotton at tbe date of its seizure, and tbe competency of Thomas Henry, tbe agent of tbe plaintiff and principal witness in bis favor, on tbe ground of interest in tbe result of tbe suit. If bis evidence is excluded, it is admitted tbe claimant cannot recover; and tbe admissibility of bis testimony depends much upon tbe light in which bis transactions as tbe agent of the claimant are to be viewed.
It appears that tbe claimant is a naturalized citizen of tbe United States, having been born in Scotland, but regularly naturalized and admitted to citizenship in tbe United States. He formerly resided at Mobile, and for many years carried on a large mercantile business in that city. In tbe year 1859, or shortly prior thereto, be retired from business, travelled abroad, and has since resided temporarily in tbe cities of Brooklyn and Baltimore, and now resides at Ypsilanti, in tbe State of Michigan.
When be left Mobile be was tbe owner of a considerable estate, both real and personal, in Alabama,, and on tbe 9th of June, 1859, be executed a power of attorney to tbe said Thomas *516 Henry, authorizing him to take possession of all the real estate of his principal, to lease or sell the same, and to make conveyances, institute suits, recover money, execute acquittances, discharges, &c. And also to take possession of and recover all sums of money, debts, goods, wares, merchandise, or rents, or demands whatever, and to take and use all lawful means for the recovery thereof; to cancel certain mortgages therein mentioned, and to assign the principal’s stock in the Mobile and Ohio Railroad Company, and to represent the same in the corporation meetings, &c., &c.
In all these respects the power is full and complete, but it goes no further. It is expressly limited to settling up the business of the principal, selling off his real and personal property, and collecting in his debts. But it does not authorize the agent in any respect to reinvest the funds of his principal, or engage in any schemes of speculation, however tempting; nor does it ¡appear from the deposition of the agent that he so understood it; for he says, after stating that he had collected about .$30,000 for the claimant, including $5,000 due from himself, .that, “I concluded to invest this money of the claimant’s, which I held as I did my own, principally in cotton. There were three .sources of investment presented to me, viz: real estate, sterling .exchange, and cotton, and I preferred the latter. For that purpose I employed an old cotton factor, John Ulrick, then a resilient of Mobile, now dead, to go into the cotton-growing region ,±o purchase cotton, with instructions not to purchase any within five miles of a railroad or river landing, and only to pur-ichase from known reliable men, and in small quantities, so as to divide the risk, this to be delivered when called for, with the understanding that it was to be taken care of by the seller until the war was over. The bales were delivered and marked in my name, and paid for. The bills hereunto annexed, numbered from one to fifteen, inclusive, are the original bills of purchase of the 260 bales of cotton, and delivered into my hands by my agent, Ulrick, and are the invoices of the identical 260 bales of cotton embraced in this suit, made out in conformity to instructions to my agent, Ulrick. This cotton was paid for out of moneys belonging to the claimant in my hands. The reason why I had the bills made out in my name, instead of the claimant’s, Avas because it would have been confiscated by the Confederate authorities, and my desire was to protect the interests of *517 tbe claimant as if they were my own. Having no communication witb tbe claimant, I acted upon my own judgment in tbe manner, I supposed, would best promote bis interest.”
From tbe bills of purchase exhibited in tbe record, it appears that all tbe cotton was purchased on and between tbe 26th of March, 1862, and tbe 7th of February, 1863. And soon after, on tbe 16th of April following, tbe witness, Henry, says be left Mobile for Ireland, and did not return until “ tbe last day of May, or tbe first day of June, 1865,” which was after tbe seizure of tbe cotton, and before tbe sailing of one of tbe vessels carrying it out.
While Henry was is Europe be says: “ I corresponded witb tbe claimant in Baltimore. In my letters, I informed him that I bad invested bis funds in cotton, on bis account.” But no response to these letters is found in tbe record, nor are tbey produced, nor does it appear that tbey were ever received by tbe claimant, or that be, in any way, through this correspondence, ratified and adopted tbe acts of bis agent.
Tbe claimant ivas hot an actual resident of any of tbe revolted States during tbe war. He left Mobile prior to tbe assumed withdrawal of tbe State of Alabama from tbe Union; and although it does not appear that be left bis former residence witb tbe intention of permanently changing bis home, be did not return until after tbe war, and has subsequently fixed bis habitation in Ypsilanti, Michigan. Tbe power of attorney, which by its terms is not general, but special in its character, was executed before tbe inauguration of tbe rebellion; and consequently after it bad swelled to tbe proportions of a war, and broken tbe bands of society, and the two contending parties bad become, as against each other, belligerent powers, it ceased to have any vitality. All intercourse by tbe laws of war, as well as tbe acts of Congress, were suspended, at tbe time tbe cotton was purchased, between tbe two contending parties; and tbe claimant could not, by bis power previously executed, authorize bis agent to do for him what be could not himself have done.
But admitting tbe suspended vitality of tbe power of attorney, it is contended that tbe acts of tbe agent were capable of ratification and confirmation after tbe war; and that a subsequent adoption by tbe principal, or a continued acquiescence in tbe acts of bis assumed agent, after such acts were brought to *518 tlie knowledge of tlie principal, is equivalent to an express previous authority.
As an abstract proposition of law, this position is not doubted; but there is an important fact to be found before the rule can be applied in this case. Does the record disclose any such ratification ? We have seen it is not to be found in the agent’s European correspondence. Where, then, is the proof of it? It is said it arises from the confidential relations of the’ parties, and the proof of the agent Henry, who says: “After the war was over, and intercourse permitted, I advised the claimant how I had acted in the premises, and he fully approved of it, and expressed his gratitude for what I. had done.”
The exact date of this ratification is not given, nor does it appear whether the information was communicated to the claimant by letter or otherwise. None of the circumstances attending it are given, and we are left to consider it in the light of the other testimony pointing to the same time, which greatly diminishes the weight to be given to this declaration. The witness Alexander Stoddart, who appears to be a nephew of the claimant’s, states that his uncle went to Mobile after the war in regard to his cotton seized at that place, and on his return to Baltimore he expressed to the witness William Bruce, introduced for claimant, doubts of the fidelity of his agent “ in investing his money in cotton.” The cotton had then been seized and shipped in the name of “Thomas Henry & Co.,” which the witness Henry says was done “from the interest my nephew had in the net proceeds of my business.” The claimant’s name was not known in the whole transaction, or his interest in any way disclosed, and it is scarcely possible that he could, under a full understanding of all the facts of the case, have ratified the acts of his agent, and in good faith thanked him for what he had done. The more reasonable hypothesis, and that which perhaps more nearly accords with the weight of the evidence, is, that after his return from Mobile he regarded the acts of his agent as without authority, and a fraud upon his interest.
Since that time the record is remarkably silent as to a single word or act of the claimant from which the slightest inference of ratification can be drawn, except the simple act of instituting this suit. And what are the circumstances attending it? The claimant’s interest is large, and his recovery from the government necessarily attended with care and attention. He takes *519 no steps to recover it until it was supposed, as Mr. Henry proves, tbe statute of limitations would soon bar bis right of action in tbis court. “He was advised,” continues tbe witness, “that there was not time before tbe expiration of tbe period limited for bringing this suit to have tbe petition sent to him and returned to Washington.” On tbe receipt of tbis advice, and acting, as we must presume, under it, be telegraphed from Ypsilanti, under date of tbe 26th of March, 1868:
“File suit in Court of Claims for cotton in my neme. Particulars by letter.
“ALEX. STODDABT.”
Tbe letter is in tbe following words:
“Ypsilanti, March 26,1868.
“THOMAS Henry, Esq.,
“ Washington, D. C.
“My Dear Friend: I telegraphed you tbis morning, ‘File suit in Court of Claims for cotton in my name. Farticula/rs by letter,’ and now write to confirm tbe same. As I expect to bear from you soon, I will await your letter before saying more, and meantime remain,
“ Yery truly, yours,
“ALEX. STODDABT.”
On tbe same day on which tbe telegram and accompanying-letter bear date, tbe petition was sworn to by tbe agent, Thomas Henry, and soon thereafter filed in tbis court.
Tbis correspondence is remarkably laconic, and singularly guarded and unsatisfactory. It admits nothing from which a ratification of tbe acts of tbe agent can be inferred, or which, we apprehend, would estop him from pursuing his remedy against bis assumed agent.
But whether tbe acts of tbe claimant can be treated as bringing tbe case within tbe rule of law prescribing tbe manner in which tbe acts of an assumed agent maybe ratified and adopted by tbe principal or not, can make no difference in tbis case.
A far more formidable question is raised in tbe record. Other rights since tbe cotton was purchased have intervened. Tbe cotton was captured, and by tbe well settled rule of tbis court, tbe title by virtue of tbe sovereign authority under which tbe seizure was made was divested out of tbe former owner and vested in'the United States. (Stewart v. The United States, *520 1 C. Cls. R., 113; Cote v. The United States, 3 id., 64, and authorities there cited.)
In such a case the law does not admit of a ratification, which will defeat the intervening rights of third parties, and it cannot matter whether the third party is an individual, a corporation, or the government of the United States. The principle is the same, and the title is as irrevocably vested in the one case as in the other.
If authority is required to sustain this position, it can be found in the following cases: 2 Kent’s Com., 614, 615, marg., and note 1, and authorities there cited.
No question can arise on the legality of the capture, under the acts of Congress regulating the seizure of enemy property. By every principle of law the legal title to the cotton was vested in the agent Henry at the time of its seizure, and if it had been burned, or lost by any other casualty, it would undoubtedly have been at the assumed agent’s loss. The name of the claimant was not known in the entire transaction, nor was the cotton purchased by any antecedent authority clothing the agent with power to mate the purchase for the benefit of the claimant. The agent acted for himself and in his own name; and the necessity of which he speaks in his testimony of investing the Confederate money which came into his hands from the sales of his principal’s property was a necessity of his own creation. The money was an illegal currency, and he was not authorized by his power to receive it for any purpose; and now after it has been received, and without authority invested in cotton, and the cotton lost, he cannot escape from the consequences of his own act by obtaining leave to file this petition in the name of the claimant, and then support it by his own testimony.
Added to this the agent' assumes to have paid a debt of $5,000 due from himself to the claimant on a gold basis,” by his unauthorized investment in the cotton seized, which, to that extent if no more, makes him directly interested in upholding this action. The debt was not paid if the cotton purchased by it was at no time vested in the claimant, and it does not directly appear that the claimant owned a single bale of cotton in Alabama, or that a dollar of his money collected by his agent had been invested in cotton at the date of its seizure. How, then, under such circumstances, can we say, in the language of *521 tbe act of Congress,be was tbe “owner” of tbe cotton at tbe date of its seizure, and as sucb bas tbe right in tbis court to maintain an action for tbe net proceeds of its sale ? It is impossible.
It follows, therefore, that tbe witness Thomas Henry, by-reason of bis interest, is incompetent, and tbe petition stands, as to tbe ownership of tbe cotton, without support, and on tbe whole tbe case must be dismissed. ■