(PRIZE.)

## The ESTRELLA.—*Hernandez*, Claimant.

The seal to the commission of a new government, not acknowledged by the government of the United States, cannot be permitted to prove itself; but the fact, that the vessel cruising under such commission is employed by such government, may be established by other evidence, without proving the seal.

Where the privateer, cruising under such a commission, was lost, subsequent to the capture in question, the previous existence of the commission on board was allowed to be proved by parol evidence.

Where restitution of captured property is claimed, upon the ground that the force of the cruiser making the capture has been augmented within the United States, by enlisting men, the burthen of proving such enlistment is thrown upon the claimant; and that fact being proved by him, it is incumbent upon the captors to show, by proof, that the persons so enlisted were subjects or citizens of the prince or state under whose flag the cruiser sails, *transiently* within the United States, in order to bring the case within the proviso of the 2d section of the act of June 5th, 1794, c. 226. and of the act of the 20th April, 1818, c. 83.

The right of adjudicating on all captures and questions of prize, exclusively belongs to the Courts of the captors' country : but, it is an exception to the general rule, that where the captured vessel is brought, or voluntarily comes, *infra præsidia* of a neutral power, that power has a right to inquire whether its own neutrality has been violated by the cruiser which made the capture ; and, if such violation has been committed, is in duty bound to restore, to the original owner, property captured by cruisers illegally equipped in its ports.

No part of the act of the 5th of June, 1794, c. 226. is repealed by the act of the 3d of March, 1817, c. 58.; the act of 1794, c. 226. remained in force until the act of the 20th of April, 1818, c. 83., by which all the provisions respecting our neutral relations were embraced, and all former laws on the same subject were repealed.

In the absence of any act of Congress on the subject, the Courts of the United States would have authority, under the general law of

nations, to decree restitution of property captured in violation of their neutrality, under a commission issued within the United States, or under an armament, or augmentation of the armament, or crew, of the capturing vessel, within the same.

APPEAL from the District Court of Louisiana.

This vessel and her cargo were libelled in the District Court for the Louisiana district, by the alleged former Spanish owner. The libel stated, that he was owner of the schooner and cargo, which sailed from Havanna, for the coast of Africa, on the 23d of April, 1817; that, on the next day, she was lawlessly and piratically captured, on the high seas, and held as prize, by an armed schooner, called the Constitution of Venezuela, and forcibly brought within the jurisdiction of the United States, when she was recaptured by the United States' ketch the Surprize, and conducted to New-Orleans. That the captors had no lawful commission from any sovereign state to commit hostilities at sea; but that the said schooner and cargo, until their re-capture, were forcibly withheld from the libellant, in open violation and contempt of the law of nations. That if they had such commission, the same was issued, or delivered, within the waters and jurisdiction of the United States, with intent that the said vessel, the Constitution, should be employed in the service of Venezuela, to commit hostilities at sea against the subjects of the king of Spain, with whom the United States then were, and now are, at peace, in violation of their laws, and of the laws of nations. The libel further stated, that the Constitution had, previously to her cruising, been fitted out, and armed,

or increased or augmented in force, within the jurisdiction and waters of the United States.; and, also, that she had been manned by sundry citizens or residents of the United States, with the intent that she should be employed to commit hostilities, as aforesaid, in violation of the laws aforesaid. For these causes the libellant prayed a restitution to him of the Estrella and cargo.

A claim was interposed by J. F. Lamoureux, prize-master of the Estrella, which stated, that the Constitution was duly commissioned by the Republic of Venezuela, and authorized to capture all vessels belonging to its enemies, under which authority she had captured the Estrella, which, with her cargo, belonged to the enemies of the said republic. That, before he could receive his prize commission, the Constitution upset, in a gale, and her commission and papers, with the greater part of the crew, were lost. The claimant further represented, that, as he was carrying the Estrella into port, to have her condemned before a court of competent jurisdiction, she was captured by the United States' ketch Surprise, and conducted to New-Orleans: and, therefore, claimed, that the Estrella and cargo might be adjudged to be restored to him.

It appears, from the transcript of the proceedings in this case, that the Estrella was also libelled on the part of the United States, although it is not stated for what cause such libel was filed, but the same was dismissed; from which decree there was no appeal.

It appeared in evidence, that the Constitution had a commission from the government of Venezuela, at the time the capture was made, which was issued and delivered at Carthagena; but that the same was lost by the sinking of the privateer, immediately after the capture. There was some contradictory testimony. as to her having increased her armament in the United States, and it was proved that she had augmented the number of her crew in the port of New-Orleans.

On the libel filed by the Spanish owner, decree was made, that the claim of Lamoureux, the prize-master, be dismissed, with costs, and that the Estrella and cargo be delivered up and restored to the libellant; from which sentence the cause was brought, by appeal, to this Court.

Mr. *C. J. Ingersoll,* for the appellant and captor, argued that the law of nations gave to the Courts of the captor's country the exclusive cognizance of questions of prizes made under its authority; and that the only exceptions to this general rule were to be found in the acts of Congress for preserving our neutral relations. In the present case, there was no sufficient evidence that the armament of the capturing vessel had been increased within the United States, so as to give our Courts jurisdiction to restore the captured property, upon this ground; and that the 2d section of the act of the 5th of June, 1794, c. 226., which prohibited the enlistment of men within our territory, was impliedly repealed by the act of March 3d, 1817, c. 58., which contained

1819.

The
Estrella.

*Feb.* 18th.

no such prohibition, and which was the law in force at the time this case occurred. But even if it were otherwise, the only proof of an increase of the crew was the hearsay of interested witnesses; and supposing their testimony to establish the fact, still the *onus probandi* was upon the claimant, to show that the persons so enlisted were not citizens of Venezuela, transiently within the United States, and so coming within the proviso of the 2d section of the act of 1794, c. 226. The existence of a commission, regularly issued by the government of Venezuela, within its own territory, which was on board the privateer previous to the capture, was sufficiently proved; and the court has already determined, that the same testimony which would be sufficient to prove that a cruising vessel is in the service of an acknowledged state, is sufficient to prove that it is in the service of a newly created government, like that of Venezuela.[a]

Mr. *Sergeant,* contra, argued, upon the facts, that the right of the original Spanish owner to restitution was established by satisfactory proof, both of the increase of the armament and crew of the privateer within the United States. He insisted, that the act of 1794, c. 226. was not repealed by that of 1817, c. 58.; and that, even if it were, the right to restitution depended upon the general law of nations, and treaties.[b] The claimant having proved the facts of

---

a The United States v. Palmer, 3 *Wheat.* 610. 635.

b 1 *Wheat.* 244. note c. 2 *Sir L. Jenkins' Works,* 727. *Ib.* 780

an increase of the crew in New-Orleans, the *onus probandi* of showing that the persons enlisted were citizens of Venezuela, transiently within the United States, was thrown upon the captors. The commission, under which the capture was professedly made, being that of a new government, not yet acknowledged by the United States, its commission ought to have been produced, and the seal proved; and if actually lost with the privateer, an exemplified copy ought to have been obtained duly authenticated by the proper officers of that government. All the circumstances of the case combined to show that this was not a capture in the regular exercise of the rights of war; but a piratical seizure, in breach of our neutrality, aggravated by an intention to violate the revenue laws, which was evinced by the fact of the vessel having been found hovering on the coast of Louisiana, instead of being conducted to the ports of Venezuela for adjudication.

Mr. Justice LIVINGSTON delivered the opinion of the Court.

The first allegation of the Spanish owner is, that the Constitution had no lawful commission from any sovereign state to commit hostilities at sea; and he contends, that the commission in the present case, if any there was, being that of a government not acknowledged by the United States, ought to have been produced, and its seal proved; or that if the vessel carrying it had been lost, yet an exemplification of it ought to have been obtained from the proper department of the state which issued it.

The Court is satisfied with the proof which has been made, of the Constitution having had a commission at the time of making the capture, and that such commission was granted by the government of Venezuela; and also, that the same was lost with the privateer herself, a very short time after the prize crew took possession of the Estrella. The fact of the sinking of the Constitution is not disputed; and that she had, at the time she went down, a commission on board, is also fully made out, which commission there is no reason to believe was any other than the one which the Collector of New-Orleans says was on board when she arrived in that port from Carthagena. This was some time in the month of October, in the year 1816: Mr. Chew then saw the commission, and describes it as a very regular one from the Venezuelan Republic, signed, as others were, by Bolivar. Although the Court, in another case, has said, that the seal of a government unacknowledged cannot be permitted to prove itself; it has, in the same case, said, that the fact of a vessel being so employed may be established without proving the seal.[a] But if the Constitution had a commission on board, it is next alleged, that the same was issued or delivered within the waters of the United States, with intent that she should be employed in the service of Venezuela, to commit hostilities, at sea, against the subjects of the king of Spain, with whom the United States were at peace. This allegation is not supported by any evidence;

a The United States v. Palmer, 3 Wheat. 635.

on the contrary, the same witnesses who declare that the Constitution was a commissioned vessel, and whose testimony has already been adverted to, establish, beyond controversy, that the same was obtained abroad, and not issued or delivered within the United States.

The libel next alleges, that the Constitution, previous to her last cruise, had been fitted out and armed, or that her force had been increased or augmented, within the jurisdiction and waters of the United States, and also that she had there been manned by sundry citizens or residents of the United States with the same intent.

Whatever doubt there may be as to the augmentation of the armament of the Constitution within the United States, the Court is satisfied that a very considerable addition was made to her crew, at New-Orleans, after her arrival at that port; one of the custom house officers declares, that, at that time, she had only from twenty to twenty-five men. Another of these officers, who went on board on her first arrival, states the number of her crew at about twenty; and a witness by the name of Guzman, totally unconnected with this transaction, mentions by name two persons who entered on board while she was lying there. Several of the original crew of the Estrella have also been examined to this point, who state, that after the capture, they had many conversations with the officers and seamen, who composed the prize crew, by whom they were informed that the Constitution, when she left Carthagena, had but few hands on board; that at New-

Orleans she shipped almost the whole of her crew, which at the time of the Estrella's capture, amounted to sixty or seventy men. This species of testimony has been objected to, as being hearsay, and proceeding from a source entitled to no great credit: although there may be something in this objection, it is no reason for rejecting the evidence altogether. If the testimony be hearsay, it must be recollected that the declarations proceeded from persons very much interested in giving a different representation of the transaction; and as to the witnesses themselves, although they formed a part of the Estrella's crew, and may have felt some little interest in the question, they were the only persons who could give any account of the armament or crew of the Constitution, at the time of her making the capture. It may be also remarked, that the testimony of these men is in this respect corroborated by that of other witnesses, who are liable to no objection, and that their declarations, if untrue, might have been disproved by the claimant, by showing where and when the crew of the Constitution had been entered. But if any of the crew of the Constitution were enlisted or entered within the jurisdiction of the United States, they may, it is said, have been citizens or subjects of the republic of Venezuela, who were transiently in the United States at the time of her arrival, and had, therefore, a right, within one of the provisoes of the second section of the act of Congress, of the 7th of June, 1794, c. 226. to enlist or enter themselves on board of her; and it is insisted, that the libellant should have shown that they were not persons of this

description. The Court is not of this opinion. On the libellant, in the first instance, lay the *onus* of showing that the crew of the Constitution, had been increased within the United States; having done this, it became incumbent on the captors, if they wanted to establish their innocence, to show, as was in their power, if the fact was so, that they had done nothing contrary to law, by bringing their case within the proviso that has been mentioned.

The allegation, then, in the libel being made out, that the Constitution, being a privateer commissioned by the republic of Venezuela, was manned within the United States, previous to the cruise on which she captured the Estrella, by sundry citizens or residents of the United States; it remains to see whether the libellant has not made out a case for restitution.

It has been attempted, but without success, to distinguish this case in principle from several which have already been decided in this Court. We have been told, as heretofore, that to the courts of the nation to which the captor belongs, and from which his commission issues, exclusively appertains the right of adjudicating on all captures and questions of prize. This is not denied; nor has the Court ever felt any disposition to intrench on this rule; but, on the contrary, whenever an occasion has occurred, as in the case of the Invincible,<sup>a</sup> it has been governed by it. Not only is it a rule well established by the customary and conventional law of nations, but it is

*a* 1 *Wheat.* 238.

1819.

The
Estrella.

founded in good sense, and is the only one which is salutary and safe in practice. It secures to a belligerent the independence to which every sovereign state is entitled, and which would be somewhat abridged, were he to condescend so far as to permit those who bear his commission to appear before the tribunals of any other country, and submit to their interpretation, or control, the orders and instructions under which they have acted. It ensures, also, not only to the belligerent himself, but to the world at large, a great degree of caution and responsibility, on the part of the agents whom he appoints; who not only give security to him for their good behaviour, but will sometimes be checked in a lawless career, by the consideration that their conduct is to be investigated by the Courts of their own nation, and under the very eye of the sovereign, under whose sanction they are committing hostilities. In this way, also, is a foundation laid for a claim by other nations, of an indemnity against the belligerent, for the injuries which their subjects may sustain, by the operation of any unjust or improper rules, which he may think proper to prescribe for those who act under his authority. But general, and firmly established as this rule is, it is not more so than some of the exceptions which have grown out of it. A neutral nation, which knows its duty, will not interfere between belligerents, so as to obstruct them in the exercise of their undoubted right to judge, through the medium of their own Courts, of the validity of every capture made under their respective commissions, and to decide on every question of prize law, which may

arise in the progress of such discussion. But it is no departure from this obligation, if, in a case in which a captured vessel be brought, or voluntarily comes, *infra præsidia*, the neutral nation extends its examination so far as to ascertain whether a trespass has been committed on its own neutrality by the vessel which has made the capture. So long as a nation does not interfere in the war, but professes an exact impartiality toward both parties, it is its duty, as well as right, and its safety, good faith, and honour demand of it, to be vigilant in preventing its neutrality from being abused, for the purposes of hostility against either of them. This may be done, not only by guarding, in the first instance, as far as it can, against all warlike preparations and equipments in its own waters, but, also, by restoring to the original owner such property as has been wrested from him, by vessels which have been thus illegally fitted out. In the performance of this duty, all the belligerents must be supposed to have an equal interest, and a disregard, or neglect of it, would inevitably expose a neutral nation to the charge of insincerity, and to the just dissatisfaction and complaints of the belligerent, the property of whose subjects should not, under such circumstances, be restored.

The United States, instead of opening their ports to all the contending parties, when at peace themselves, (as may be done, if not prevented by antecedent treaties,) have always thought it the wisest and safest course, to interdict them all from fitting out or furnishing vessels of war within their limits, and to punish those who may contribute to such equip-

1819.

The
Estrella.

ments.  To enforce a general and strict observance of this neutrality, on the part of our own citizens, and of others who reside among us, a law passed, as early as the year 1794, making it penal, among other things, for any one, within the jurisdiction of the United States, to enlist in the service of any foreign prince or state, as a soldier, marine, or seaman, on board of any vessel of war, letter of marque, or privateer. This law, it is supposed, was not in force at the time when the crew of the Constitution was increased at New-Orleans, having been repealed, as is alleged, by the act of the 3d of March, 1817, c. 58. But this act contains no repealing clause of this or any other section of the former law ; and having made no provision on the subject of enlistment, it must have been the intention of the legislature to leave in full force all those parts of the first law which had undergone no alteration, in the one which was then passing, and we therefore find no repeal of the act in question, until the 20th of April, 1818, when all the provisions respecting our neutral relations were embraced by one act, and all former laws on the same subject were repealed.  But whether the act of 1794, c. 226. were in force or not, would make no difference ; for it did not, in terms, contain, nor did any of the others, which have, from time to time, been passed, contain a provision for the restitution of property captured on the ocean, by vessels which might be thus illegally fitted out, or manned in our ports.  It is true, they recognize a right in the Courts of the United States to make restitution, when these laws have been disregarded, and impart

to the Courts a power to punish those who are con-cerned in such violations. But in the absence of every act of Congress in relation to this matter, the Court would feel no difficulty in pronouncing the conduct here complained of, an abuse of the neutrality of the United States ; and although, in such case, the offender could not be punished, the former owner would, nevertheless, be entitled to restitution. Nor is our opinion confined to the single act of an illegal enlistment of men, which is the only fact proved in this case ; for we have no hesitation in saying, that for any of the other violations of our neutrality alleged in the libel, if they had been proved, the Spanish owner would have been equally entitled to restitution.

Sentence affirmed, with costs.