## THE APPAM.

### (District Court, E. D. Virginia. July 29, 1916.)

1. WAR ☞16—PRIZE—RIGHT OF ASYLUM IN NEUTRAL PORT—TREATY—NEUTRALITY LAWS.

Article 19 of the treaty of July 11, 1799, between Prussia and the United States (8 Stat. 172) renewed in its essentials by article 12 of the treaty of 1828 (8 Stat. 384), which provides that "the vessels of war, public and private, of both parties, shall carry freely, wheresoever they please, the vessels and effects taken from their enemies, * * * nor shall such prizes be arrested, searched, or put under legal process when they come to and enter the ports of the other party, but may freely be carried out again at any time by their captors to the places expressed in their commissions," applies only to prizes brought into the ports of one country by vessels of the other for necessary temporary purposes, as in case of stress of weather, want of fuel or provisions or necessity of repairs, and contemplates their removal to a port of the captor country as soon as the cause of their entry has been removed. Neither under such treaty nor under the doctrines of international law as generally accepted by civilized nations at the present-day may a prize be taken alone by a prize crew into a port of a neutral country for indefinite asylum, or there held pending a disposition of her case by a prize court of the captor country.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig. ☞16.]

2. WAR ☞16—PRIZE—JURISDICTION OF COURTS OF NEUTRAL COUNTRY.

Courts of admiralty of the United States have jurisdiction to entertain actions for the restitution to their owners of prizes of war because of violation of the neutrality laws, and such jurisdiction is not limited to cases of capture within the territorial limits of this country, or where the capturing vessel was illegally fitted out in this country, but extends to a case where the right to restitution of the prize property is claimed by reason of its having been brought into our ports in violation of our neutrality.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig. ☞16.]

3. WAR ☞16—PRIZE—JURISDICTION OF COURTS OF NEUTRAL COUNTRY.

Under modern authority title to a prize does not become vested in the captor by the mere fact of capture, and not until lawful condemnation is had by the proper court of the captor country. This is particularly true where the prize is not taken into the captor country and an uncondemned prize, taken into a port of a neutral country for asylum in violation of its neutrality, is subject to proceedings by its owner for restitution in the admiralty courts of that country irrespective of the action of the prize courts of the captor country.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig. ☞16.]

In Admiralty. Suits by British and African Steam Navigation Company, Limited, against the steamship Appam, and by Henry G. Harrison, master, against the cargo of the steamship Appam to recover possession of vessel and cargo. Decree for libelants.

These are suits in admiralty, brought respectively by the owner and master, to recover possession of the British steamship Appam, now lying at Newport News, Va., and her cargo.

On the 15th of January, 1916, about 3 o'clock in the afternoon, during the existence of a state of war between the Empires of Great Britain and Ger-

many, the steamship Appam was captured on the high seas by the German cruiser Moewe, in latitude 33.19 N., longitude 14.24 W.

The Appam, flying the British flag, and registered as an English vessel, is a modern passenger and cargo steamship, 440 feet long, 58 feet broad, 35 feet deep, and 7,800 tons gross burden, built in Belfast, Ireland, in February, 1913, since which time she has been engaged in commerce, with the exception of a short period about a year prior to her capture, as hereinafter shown, when she was used as a transport for troops. She had made 12 voyages to, and was on the return trip of her thirteenth voyage from, the West Coast of Africa to Liverpool, carrying a general cargo of coca beans, palm oil, kernels, tin, maize, 16 boxes of specie, and other articles. At the West African port, she took on 170 passengers, of whom 22 were Germans, 19 men and 3 women, eight of them being military prisoners of the English government. She had a crew of about 160 all told, and carried a three pounder gun on her stern.

The Moewe, flying the German ensign, approached the Appam on her starboard side, and when about 100 yards away, fired a gun across the bow of the latter as a signal to stop, which she did, and she was boarded, without resistance, by an armed crew from the Moewe, who brought with them several buckets with peculiar looking things in them, some round. Two bombs were slung, one over the bow, and one over the stern of the Appam. An officer from the Moewe said to the captain of the Appam that he was sorry, but he had to take his ship, and asked him how many passengers he had, and what cargo; whether he had any specie, and how much coal. When the shot was fired by the Moewe, the captain of the Appam instructed his wireless operator not to touch the wireless instrument, and his officers "on no account to let any one touch that gun we have on board." The officers and crew of the Appam, with the exception of the engine room force, 35 in number, and the second officer, were then ordered on board the Moewe, where the captain was told by the officer commanding that vessel: "You are a very lucky man; I would have fired at you if you had attempted to escape; I would have sunk you." The captain, officers, and crew of the Appam were then sent below, between-decks, down in the hold, where they were kept until the evening of the 17th of January, when they and also about 150 persons, officers, and crews of five or six vessels previously sunk by the Moewe, were ordered back to the Appam, and kept on board as prisoners. At the time of the capture, the senior officer of the boarding party told the chief engineer of the Appam that he was now a member of the German Navy; to which the chief replied that he did not think he was; and the senior officer said "This is no laughing matter, and if you do not obey my orders, I will blow your brains out, but if you obey me, not a hair of your head will be touched." He also told them to tell his staff the same thing, and if they did not obey his orders, to bring them to him, and they would be shot. He thereupon inquired as to the quantity of coal on hand, the various revolutions of the engines, also the coal consumption for different speeds, and directed that steam be kept up handy, and about 6 o'clock in the evening, the engineer was directed to set the engines at the revolutions required, and they got under way. The German officer told the chief engineer to report to him at 8 o'clock the next morning, the tonnage of coal and stores that he had, which he did. On reporting on the second morning, Mr. Berg was, for the first time, seen by the engineer, and he was told that he (Berg) was now in charge of the ship, and asked him for the same information as to fuel consumption and revolutions which he had given to the former officer, and also said that he expected the engineer to help him all he could, and the more he did for him the better it would be for everybody on the ship. The engineer said he would, and did do so. The engines were operated with a bomb secured to the port main injector valve, and a German sailor was stationed alongside the bomb with a revolver. There was a guard below of four or five armed Germans, who relieved each other, and were constantly in the engine room, but did not interfere with the working of the engines. Lieut. Berg gave directions as to working the engines, and was the only officer on board who wore uniform. On the night of the capture, January 15th, the specie in the specie room was taken by the boarding party and lowered into a boat, and then taken on board the raider. After Lieut. Berg was put in charge of the

Appam, and the officers and men were ordered back on board of her, bombs were slung over her bow and stern, one large bomb, said to contain about 200 pound of explosives, was placed on the bridge, and several smaller ones in the chart room. When the captain of the Appam came on board from the Moewe, Lieut. Berg pointed to a large object standing on the deck, and said to him: "That is a bomb; if there is any trouble, mutiny, or attempt to take the ship, I have orders to blow up the ship instantly." He also said: "There are other bombs about the ship; I do not want to use it, but I shall be compelled to if there is any trouble." During the passage, the captain of the Appam asked Lieut. Berg if they met an English cruiser what would be done, and Lieut. Berg replied that if possible he would give them 10 minutes to get into the boats, but if the cruiser attempted a capture, she would be blown up. The bombs were kept in the positions stated until the ship arrived at the Virginia Capes, when they were removed, and Lieutenant Berg asked the crew of the Appam to drop the anchor, as he had not men to do it, on reaching Hampton Roads.

During the trip westward, the officers and crew of the Appam were not allowed to see the ship's compass to ascertain her course; and all lights were obscured during the voyage; no one was allowed to smoke or strike matches on deck, and the power of the navigation lights was lessened also. The German prisoners, with the exception of two who went on board the Moewe, were armed, and placed over the passengers and crew of the Appam as a guard all the way across. They wore armulets, consisting of a white band around the arm, and had rifles and revolvers, and received their orders from Lieut. Berg.

For two days following the capture, the Appam remained in the vicinity of the Moewe, until she was started westward. Her course for the first two or three days was southwesterly varying, and afterwards westerly, and so continued until her arrival at the Virginia Capes on the 31st of January. The entire engine room staff of the Appam was on duty operating the vessel across to the United States; the deck crew of the Appam kept the ship clean, and the navigation was conducted entirely by the Germans, the lookouts being mostly German civilian prisoners. The night before the Appam arrived at the Capes, all of her crew were ordered below, and not allowed on deck after 9 o'clock.

At the time of the capture, the Appam was approximately distant 1,590 miles from Emden, the nearest German port, and from the nearest available port, namely Punchello, in the Madeiras, 130 miles; from Liverpool, 1,450 miles, and from Hampton Roads, 3,051 miles.

The evidence shows that the Appam was in first-class order, quite seaworthy, and with plenty of provisions both when captured and at the time of her arrival in Hampton Roads.

There is no conflict in the testimony as to the facts stated, the same having been testified to by the master, first officer and chief engineer of the Appam. No witnesses were called in reply by the respondents, though Lieut. Berg was present in court during the entire trial, and the German crew remaining with him on the ship were within easy call of the court.

Upon her arrival at Hampton Roads, the collector of the port was duly advised of the presence of the ship by Lieut. Berg, and application was at once made to the secretary of state for the vessel's internment, and also for the internment of the crew of the Appam, because of alleged resistance to capture. The right of internment of the Appam was denied, and her crew was released with their personal effects.

Subsequent to the filing of the libels, the perishable portion of the cargo of the Appam was ordered sold by the court, bringing some $634,000, which fund is now in the registry of the court awaiting the court's determination of this matter.

Frederick R. Coudert, James K. Symmers, Howard Thayer Kingsbury, and Ralph James M. Bullowa, all of New York City, and Hughes & Vandeventer, of Norfolk, Va., for libelants.

John W. Clifton, of Washington, D. C., Norvin R. Lindheim, of New York City, Walter S. Penfield, of Washington, D. C., and Hughes, Little & Seawell, of Norfolk, Va., for respondents.

WADDILL, District Judge (after stating the facts as above). From this brief summary of the facts, it will be seen that the question for consideration is whether the vessel and her cargo, belonging to a subject of Great Britain, captured by a cruiser of the German Empire, upon the high seas, during the existence of war between the two countries, can be brought by a prize master and crew into the waters of the United States, for the purpose of being there laid up.

The libelants earnestly urge that this cannot be done, and that the coming in, as well as the insistence upon the right of asylum under the circumstances of this case, constitutes a violation of the neutrality of the United States, entitling the owners to restitution of their property; whereas, the respondents maintain the right to bring in their prize, as well as the right of asylum for the same, during pleasure, pending the continuance of the war, and insist that such right exists as well under general international law as under treaty existing between this country and Prussia, now a part of the German Empire; that the prize is the property of the German government by reason of its capture from a citizen of a belligerent country on the high seas, by one of its duly commissioned war vessels; that the title or right of possession thereto cannot be inquired into by this government, or the respondents impleaded in the courts of the United States; that the court of the captor country alone can determine the validity of the seizure and title to said prize; and that this government, under the existing treaty cannot deny to the capturing country the right of asylum for said prize.

The court has been most fortunate in having the benefit of the arguments of able and accomplished counsel presenting the respective contentions; and almost every conceivable question and kindred subject, bearing incidentally on the issues involved, have received the careful consideration of counsel, and the case has been fully, ably, and completely presented and argued, which greatly lightens the burden of the court in reaching its conclusion, as well on the merits of the controversy, as in determining the crucial points involved, and eliminating those unnecessary to be passed upon.

The court will not attempt any general discussion or review of the authorities upon many of the views presented, as to do so would serve no good purpose, and unduly lengthen this opinion, but will confine itself to the consideration of the several material questions arising in the case, under its peculiar facts and circumstances. This, it will be borne in mind, is not a case of a war, public, or merchant vessel seeking internment in the waters of the United States, nor of any such vessel coming in for temporary sojourn; nor a war vessel bringing in its prize captured at sea; nor of such war vessel sending its prize under the convoy of a war vessel; nor of a captor with its prize, forced in by reason of stress of weather, want of fuel or provisions, or for necessary repairs; but that of a vessel captured at sea, placed in charge of a prize master and 22 German sailors, who had been British prisoners on the Appam, and who, together with the Appam's crew, working under duress and threat of the loss of their lives, navigated the ship across the ocean, some 1,500 miles further from the scene of the cap-

ture than to the nearest German port, into Hampton Roads, an inland water of the United States, within the jurisdiction of this court, for the purpose of indefinite asylum; the wording of the commission of the prize master being to "take her to the nearest American port and there to lay her up."

Treating this case in its true light, these considerations arise, and become material, namely: (1) What are the rights existing between this country and Germany, respecting the right of entry of prizes of war captured at sea, and of asylum, in the waters of the United States, whether arising under treaty or international law; (2) has this court jurisdiction to entertain these suits for restitution of the property in question to its owners; and (3) what is the character of the property seized, whether public or private, and can the court, as against the German government, who claims the right to adjudicate its title by its own prize court, determine the rights thereof, and afford relief as between the litigants.

[1] *First.* The respondents vigorously maintained from the coming in of the prize, and the inception of this litigation, the right to bring the Appam and her cargo in for the purpose of asylum, as well under treaty with this country, as under international law, and rely especially on the treaty between the United States and Prussia of 1799, as renewed and continued in 1828, in support thereof.

Promptly after the institution of these proceedings, the German government, acting through its Ambassador at Washington, filed protests with the Secretary of State of the United States, against the prosecution of the same, and the seizure of the ship and cargo, and requested that the United States, through their proper legal department, intervene, and cause the dismissal of the proceedings. Whereupon the Attorney General, acting through the United States attorney for this district, appeared as amicus curiæ, and brought to the attention of the court the aforesaid position of the German government; and the same defense was, in more elaborate form, interposed by the German government, in the proceedings in this cause. The German Ambassador, Count J. H. von Bernstorff, stated his government's position in his communication to the Secretary of State, as shown by the following extracts therefrom:

"As the Appam was captured at sea by a German man of war and brought to the Virginia port as a prize ship according to the treaty existing between our countries, you may well appreciate my surprise at the action which has been taken.

"Article 19 of the treaty of 1799 between Prussia and the United States, renewed in part by article 12 of the treaty of 1828, provides that 'the vessels and effects taken from' the enemies of the contracting parties may be carried freely wheresoever they please and that such prizes shall not be 'put under legal process, when they come to and enter the ports of the other party,' etc.

"In view of the terms of the treaty, I am at a loss to understand why such action has been taken by a court of your country. * * *

"Besides the Appam flies the naval flag of and belongs to the German government and therefore the possession of the captors in a neutral port is the possession of their sovereign. The sovereign whose officers have captured the vessel as a prize of war remains in possession of that vessel, and has full power over her. The neutral sovereign or its court can take no cognizance of the question of prize or no prize, and cannot wrest from the possession of the captor a prize of war brought into its port."

He insisted also that article 21 of the Hague Conventions concerning the rights and duties of neutral powers in naval war had no application, because not assented to by Great Britain. In a later communication, he further contended that his government was entitled to the rights claimed under general principles of international law, as well as under the specific terms of the treaty aforesaid.

The Secretary of State, Hon. Robert Lansing, although he complied with the German Ambassador's request to make known his country's contention to the court, made specific reply to his communications, setting forth his interpretation of the treaty relied on, as well as his understanding of the international law involved, and the position of the government of the United States regarding both matters, and of the right of the Appam and her cargo to seek asylum in the waters of the United States. The following extracts from the letters of the secretary of state to the German Ambassador, dated respectively March 2 and April 7, 1916, show fully and clearly his conclusions and rulings in the premises (from letter of March 2, 1916, referred to):

"Article 19 of the treaty of 1799, to which Your Excellency refers, reads as follows:

"The vessels of war, public and private, of both parties, shall carry (conduire) freely, wheresoever they please, the vessels and effects taken (pris) from their enemies, without being obliged to pay any duties, charges, or fees to officers of admiralty, of the customs, or any others; nor shall such prizes (prises) be arrested, searched, or put under legal process, when they come to and enter the ports of the other party, but may freely be carried (conduites) out again at any time by their captors (le vaisseau preneur) to the places expressed in their commissions, which the commanding officer of such vessel (le dit vaisseau) shall be obliged to show. But conformably to the treaties existing between the United States and Great Britain, no vessel (vaisseau) that shall have made a prize (prise) upon British subjects shall have a right to shelter in ports of the United States, but if (il est) forced therein by tempests, or any other danger or accident of the sea, they (il eera) shall be obliged to depart as soon as possible."

"(The last provision of the above treaty, excepting Great Britain from its operation, was abrogated by the treaty of 1828.)

"This translation is taken from the published treaties of the United States, and while not conforming strictly to the original French text (a copy of which is inclosed), is sufficiently accurate for the purposes of this note. At the outset it may be pointed out that as the object of this provision was to mollify the existing practice of nations as to asylum for prizes brought into neutral ports by men of war, it is subject to a strict interpretation when its privileges are invoked in a given case in modification of the established rule. By a reasonable interpretation of article 19, however, it seems clear that it is applicable only to prizes which are brought into American ports by vessels of war. The Appam, however, as Your Excellency is aware was not accompanied by a ship of war, but came into the port of Norfolk alone in charge of a prize master and crew. Moreover, the treaty article allows to capturing vessels the privilege of carrying out their prizes again 'to the places expressed in their commissions.' The commissions referred to are manifestly those of the captor vessels which accompany prizes into port and not those of the officers of the prizes arriving in port without convoy, and it is clear that the port of refuge was not to be made a port of ultimate destination or indefinite asylum. In the case of the Appam, the commission of Lieutenant Berg, a copy of which was given to the Collector of Customs at Norfolk, not only is a commission of a prize master, but directs him to bring the Appam to the nearest American port, and 'there to lay her up.' In the opinion of the government of the United States, therefore, the case of the Appam does not fall within the evident meaning of the treaty provision which contemplates temporary asylum for vessels of war accompanying prizes while en route to the places named in the

commander's commission, but not the deposit of the spoils of war in an American port. In this interpretation of the treaty, which I believe is the only one warranted by the terms of the provision and by the British treaties referred to in article 19, and by other contemporaneous treaties, the government of the United States considers itself free from any obligation to accord to the Appam the privileges stipulated in article 19 of the treaty of 1799.

"Under this construction of the treaty, the Appam can enjoy only those privileges usually granted by maritime nations, including Germany, to prizes of war, namely, to enter neutral ports only in case of stress of weather, want of fuel and provisions, or necessity of repairs, but to leave as soon as the cause of their entry has been removed."

(From letter of April 7, 1916, referred to.)

"The government of the United States agrees with the German government's statement that the treaty speaks of a mode of warfare in use at the time the treaty was negotiated. It is precisely for this reason that the government of the United States does not believe that the treaty was intended to apply to circumstances of modern warfare which are essentially different from those in vogue at the close of the eighteenth century. The government of the United States does not understand upon what ground the imperial government contends that a treaty granting concessions under specifically mentioned circumstances, can be construed to apply to a situation involving other and different circumstances. To grant limited asylum in a neutral port to a prize accompanied by the capturing vessel is not the granting of a right of 'laying up' in a neutral port a prize which arrives in the control of a prize master and crew.

"Your Excellency's government further contends that article 19, besides being applicable to modern conditions, is not contrary to the general rules of international law, and therefore not subject to a restricting interpretation, and in support of this cites as declaratory of the general rules of international law article 23 of Hague Convention 13. As indicated by the imperial government, the United States did not in the case of this convention, and never has, assented to the sequestration of prizes in its ports. The ground of this position of the United States is that it does not, in the opinion of this government, comport with the obligations of a neutral power to allow its ports to be used either as a place of indefinite refuge for belligerent prizes, or as a place for their sequestration during the proceedings of prize courts. The contention of the government of the United States in its note of March 2d in this case, is consistent with this long-established and well-known policy of the American government in the light of which the treaty of 1799 was negociated and has been enforced and applied. Provided the vessel enters an American port accompanied by a German naval vessel, article 19 contemplates in the view of this government merely temporary sojourn of the prize in an American port and not its sequestration there pending the decision of a prize court.

"Holding the view that article 19 is not applicable to the case of the Appam, this government does not consider it necessary to discuss the contention of the imperial government that under article 19 American courts are without jurisdiction to interfere with the prize, and for the same reason it cannot accede to the request that the 'legal steps before an American court should be suspended.' "

The letter further stated that the question of the court's jurisdiction was one for judicial ascertainment, and not executive determination.

The correct determination of the questions presented by the notes of the diplomatic representatives of the two governments will, in large measure, dispose of the more important issues involved in this litigation, since it is apparent that if the view taken by the German Ambassador of the Prussian treaty be accepted, then the Appam had the right by express treaty to come in for the purpose of laying up, as her prize master's commission directed; and the German government would be entitled to the free use of the waters of the United States

during the existence of the war, as a rendezvous, or indefinite place of abode for prizes of war.

The gravity of this situation is manifest, and if the contention is correct, its value to the German government, on the one hand, and the serious responsibilities and consequences to the United States on the other, cannot well be overestimated. The weight that should be given to the opinion and ruling of the secretary of state, an able and accomplished diplomat, in construing the Prussian treaty, need not be dwelt upon, since the court is in full accord with his interpretation, further than to say that it has special significance as a decision and ruling of the executive branch of the government, having to do with international matters, rendered after its authority had been invoked by the German government, in this very matter.

The history of the adoption of this treaty with Prussia, the conditions that brought about the same, and the contemporaneous opinions of the eminent statesmen of that day, who participated in its procurement and acceptance by the two countries, has been gone into fully in the effort to show that it was meant to give asylum to prizes in neutral waters, and that its particular purpose was to afford the United States an asylum for their prizes in Prussian waters. Whatever may have been the view of those representing this country at that time, it seems clear to the court that no such enlarged and far-reaching view of the treaty as is now claimed for it, can, for a moment, be entertained at this day, in the light of present methods of warfare, and the laws, rules, and regulations affecting the neutrality of nations in existence now for nearly one hundred years. Anciently it was believed permissible for one nation to grant to another rights and privileges in its waters not granted to others. Such may be said to have been the character of our treaties of Amity and Commerce of 1778, with France; but the painful outcome of our experiences, growing out of those treaties, and the position taken by this government, ultimately, in connection with them, would seem to dispel the idea that this country, even in that early period, ever intended to afford a harbor of refuge for prizes of war of any other nation, and certainly such idea is now uniformly negatived by the customs of all nations. Article 17 of the Treaty of Amity and Commerce is substantially in the terms of the Prussian treaty now being considered; and under the interpretation placed upon it by the United States (see Mr. Jefferson's letter to Gallatin, June 28, 1801, Moore's Digest, § 1302, p. 931), the claim here made that a prize master could bring in his prize for indefinite asylum was not maintained.

A careful review of the provisions of the Prussian treaty, when read in the light of the rulings and interpretation placed upon other contemporaneous treaties, especially article 17 of the Treaty of Amity and Commerce with France in 1778, convinces the court that the secretary of state's ruling is correct, and that under the same, prizes cannot be brought into the waters of the United States for the purpose of laying up by a prize master, but can only be brought in by the capturing vessel herself, or a war vessel acting as convoy to such prize, and

then, not for an indefinite period, but for the temporary causes recognized by international law.

What are the rights of the Appam under general international law? Was she entitled to come into the waters of the United States, and, if so, has she the right of asylum therein? These questions must be answered in the light of that law. The generally accepted doctrine, now, is that enlightened nations do not allow the use of their ports as asylum or permanent rendezvous of prizes of other nations captured during war. To do so would tend to involve the neutral powers in conflict with nations with whom they are at peace; and to extend the use of their ports to all belligerents alike, would not relieve the objection, as the opposing vessels so using them might quickly cause conflict in neutral territory. The policy of the United States has been, and is, consistently opposed to such use of their waters and harbors; and the history and origin of their neutrality laws, and the circumstances of their passage, clearly indicate a purpose to prohibit the use of their ports for the laying up of belligerent prizes.

The provisions of articles 21 and 22 of the Hague Convention (13) of 1907 are declaratory of the existing law of nations, and the fact that article 23, which provided for the use of neutral ports by belligerent prizes, was expressly rejected, and 21 and 22 adopted by the United States, but emphasizes its policy respecting the subject. It is true Great Britain did not ratify the action of its commissioners, assenting to the provisions of articles 21 and 22 of the Hague Convention, though most of the other powers, some 43 in number, including Germany and the United States, did. Still, it nevertheless shows what the policy of the United States and Germany alike was, in regard to the use of their waters and harbors for belligerent prizes. Articles 21 and 22 are as follows:

"Article 21. A prize may only be brought into a neutral port on account of unseaworthiness, stress of weather, or want of fuel or provisions.

"It must leave as soon as the circumstances which justified its entry are at an end. If it does not, the neutral power must order it to leave at once; should it fail to obey, the neutral power must employ the means at its disposal to release it with its officers and crew and to intern the prize crew.

"Article 22. A neutral power must, similarly, release a prize brought into one of its ports under circumstances other than those referred to in article 21."

The American delegates reported regarding these articles:

"Articles 21 and 25 relate to the admission of prizes to neutral ports. Articles 21 and 22 seem to be unobjectionable. Article 23 authorizes the neutral to permit prizes to enter its ports and to remain there pending action on their cases by the proper prize courts. This is objectionable for the reason that it involves a neutral in participation in the war to the extent of giving asylum to a prize which the belligerent may not be able to conduct to a home port. This article represents the revival of an ancient abuse, and should not be approved."

The Hague Convention (13) was signed at The Hague on the 13th of October, 1907, and was ratified by the Senate of the United States in executive session on the 17th of April, 1908. That body, however, excepted and excluded article 23 (36 Stat. L. pt. 2, p. 2438). The law,

as shown in Dana's note (1866) to Wheaton's International Law (8th American Ed.) § 391, is as follows:

"The modern practice of neutrals prohibits the use of their ports by the prize of a belligerent, except in cases of necessity; and they may remain in the ports only for a meeting of the exigency. The necessity must be one arising from perils of the seas, or need of repairs for seaworthiness, or provisions and supplies."

The British government, at the beginning of the Civil War in the United States, took this position, and so instructed the British admiralty. · Subsequently, like position was taken by other prominent powers, and the same view has been taken generally from time to time by different nations down to our war with Spain in 1898, and to the present time. It was said by Attorney General Wirt:

"It would be a breach of neutrality to permit a port to be made a cruising station for a belligerent, or a depot for his spoils and prisoners. It is not a breach of neutrality to permit a vessel captured as prize to be repaired in our ports, and put in a condition to be taken to the port of the captor for adjudication." 2 Op. Atty. Gen., 86.

Mr. Seward, Secretary of State, replying to the Peruvian Legation as to the position of the United States respecting the war between Spain and Peru, said:

"This government will observe the neutrality which is enjoined by its own municipal law and by the law of nations. No armed vessel of either party will be allowed to bring their prizes into the ports of the United States." Moore's Digest, § 1302, p. 738.

In the Flad Oyen Case (1 C. Rob. 135) Lord Stowell, considering the subject, said:

"It gives one belligerent the unfair advantage of a new station of war which does not properly belong to him, and it gives to the other the unfair advantage of an active enemy in a quarter where no enemy would naturally be found. The coasts of Norway could no longer be approached by the British merchant with safety, and a suspension of commerce would soon be followed by a suspension of amity.

"Wisely, therefore, did the American government defeat a similar attempt made on them, at an earlier period of the war; they knew that to permit such an exercise of the rights of war within their cities would be to make their coasts a station of hostility."

Reference may also be had to Hall's International Law (5th Ed.) p. 618, and Laws of War, Risley, p. 176; Bluntschli on International Law, § 778, Int. Law, Note.

The right of belligerents to use neutral waters, as an asylum for prizes, can no longer be successfully contended for.

[2] *Second.* Considering the question of the jurisdiction of the court to entertain these suits, for restitution of the Appam and her cargo to the owners of the same, raised by the respondent, and earnestly insisted upon in argument, it may be said, without discussing the precedents of other countries favorable thereto, that the jurisdiction and authority of the courts of admiralty of the United States to entertain possessory actions for the restitution to their owners, of prizes of war seized for violation of the neutrality laws, is no longer open for serious consideration. The subject was long one of much con-

troversy, particularly whether restitution should be made by the executive or judicial branches of the government, and the authorities for a time sustained the view that the courts were without such power. Moxon v. The Fanny, 2 Pet. Adm. 309, Fed. Cas. No. 9,895; Findlay v. The William, 1 Pet. Adm. 12, Fed. Cas. No. 4,790; Stannick v. The Ship Friendship, Bee Adm. 40, Fed. Cas. No. 13,291; Moodie v. The Ship Amity, Bee Adm. 89, Fed. Cas. No. 9,741.

But this position is no longer maintainable, and has not been since the decision of the Supreme Court in the case of The Betsy, 3 Dall. 6, 1 L. Ed. 485. There the question of jurisdiction was directly raised, and the Supreme Court held that the district courts, being possessed of all the powers of courts of admiralty, instance as well as prize courts, were competent to decide whether restitution should be made, and the law has been thus settled for more than 100 years. The Santissima Trinidad, 1 Brock. 478, Fed. Cas. No. 2,568, affirmed in 7 Wheat. 283, 5 L. Ed. 454, a case from this court, was a decision of Chief Justice Marshall, sitting in the Circuit Court, in which he at length considered the question of whether restitution could be made, as well by the court, as by the executive branch of the government, and whether the same should be awarded at the instance of the private owners, and he sustained the jurisdiction of the court in both particulars, and ordered restitution of the prize seized for violation of the neutrality laws of the United States, to its owners. The Supreme Court, on appeal, affirmed the decision of the District Court, rendered by Judge Saint George Tucker, the able jurist and author, and that of Chief Justice Marshall, sitting in review on circuit, and said:

"1. That 'whatever may be the exemption of the public ship herself and of her armament and munitions of war, the prize property which she brings into our ports is liable to the jurisdiction of our courts for the purpose of examination and inquiry, and, if a proper case be made out, for restitution to those whose possession has been divested by a violation of our neutrality.' "

It is earnestly insisted on behalf of the respondents that notwithstanding these and like decisions containing the same views, restitution will be decreed only in cases where the prize was captured within the territorial limits of the United States, or the capturing vessel was illegally fitted out in this country, and that the court is without jurisdiction, save in the two classes of cases named.

There is much force in this position, especially as the adjudicated cases in the United States Supreme Court are mainly confined to those arising from the violation of the neutrality of one or other of the two prescribed classes. But it does not follow that had there been neutrality violations in other respects, a like remedy would not have been accorded. The jurisdiction was assumed, and the remedy afforded, because of the violation of the neutrality of the United States; and, where the same arose either from an invasion of our territory by a belligerent, and the capture of an enemy vessel in our waters, or by the fitting out of a vessel within this country for the purpose of depredating upon the commerce of the enemy, undoubtedly relief could be afforded by the restitution of the property thus unlawfully and forcibly taken, to its lawful owners. It was, however, not because

it occurred in either of the two ways indicated. Had a like result followed in other unlawful manner, whereby there was an infraction of the neutrality of the United States, exactly the same relief should and would have been given. The question, therefore, to be determined in the present case is, in the language of the Supreme Court in the Santissima Trinidad Case, 7 Wheat. 354, 355, 5 L. Ed. 454, whether a proper case has been made out against the prize property, upon examination and inquiry, justifying its restitution to those from whom it was taken, by reason of bringing the same into our ports in violation of our neutrality; if so, the relief asked for by the libelants should be granted, entirely regardless of whether a like case may have heretofore arisen, or whether any other court of the United States may have been called upon to meet a similar contingency. Let it once be conceded that the prize is within neutral territory, and it was there brought in violation of the laws of neutrality, whether arising from breach of treaty obligation, or by reason of international law, then, under the laws of the United States, the right of restitution arises, and its courts of admiralty, charged with the administration and enforcement of international law respecting maritime matters, should, in a proper case, afford relief, by restoring the prize property to its lawful owner.

In Paquete Habana, 175 U. S. 677, 700, 20 Sup. Ct. 290, 299 (44 L. Ed. 320), Mr. Justice Gray, speaking for the Supreme Court, said:

"International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty, and no controlling executive or legislative act, or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, * * * not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." Hilton v. Guyot, 159 U. S. 113, 163, 164, 214, 215, 16 Sup. Ct. 139, 40 L. Ed. 95; The Estrella, 4 Wheat. 298, 4 L. Ed. 574; The Brigantine Vrow Christina Magdalena, Fed. Cas. No. 7,216; The Adventure, 8 Cranch, 221, 3 L. Ed. 542.

The last-named case is an illuminating one in the light of the contention made here. The Adventure was a British vessel which had been captured on the high seas by two French frigates, and after taking out parts of her cargo, she was given by the captors to the American crews (then neutral) of two vessels which the French frigates had just captured and burned. The Adventure was thereupon navigated by her donees to Norfolk, where she arrived on the 1st day of October, 1812, and was promptly libeled by the acting captain and crew as their property, acquired under the donation of the French captor. The United States appeared and interposed a claim for forfeiture under the "Nonimportation" act. The case finally reached the Supreme Court of the United States, where it was decided adversely alike to the claim of the government, and that of the libelants and determined in favor of the British owners, subject to the adjustment of complications which had arisen between that government and this country, growing out of hostilities which occurred after the bringing in of the prize property; and that the donees, the libelants, as citizens

of a neutral country, were entitled only to a proper reward for safe-keeping the property, and bringing it into a neutral port, the court saying:

"Upon the donation, therefore, whatever right might, in the abstract, have existed in the captor, the donee could acquire no more than what was consistent with his neutral character to take. He could be in no better situation than a prize master navigating the prize in pursuance of orders from his commander. The vessel remained liable to British capture on the whole voyage, and, on her arrival in a neutral territory, the donee sank into a mere bailee for the British claimant, with those rights over the thing in possession which the civil law gave for the care and labor bestowed upon it."

This decision is significant in its bearing upon this case. It was a capture on the high seas, and jurisdiction was entertained, and the property restored to its owner, although it did not come within the two exceptions contended for by the respondents. Moreover, it negatives the idea of a complete title in the captor, and in effect maintains that the prize master could not have brought the prize into neutral waters, without forfeiting the same to the owner; and that his right to bring the vessel infra presidia (a place of safety) into this country, unless excused on account of necessity, would have been an unneutral act, reviving the right of the owner to the vessel.

The Queen v. The Chesapeake, 1 Oldright's Nova Scotia Reports, 769, was the case of an American vessel sailing from New York, captured by certain persons bearing a commission from the Confederate States government, shipped thereon as passengers. After sailing from New York, they overpowered the captain and crew, and took the vessel into a Canadian port. Suit was instituted in the name of the crown for forfeiture of the vessel for violation of the British neutrality. Claim was made on behalf of the private owners, and restitution was ordered, on payment of costs and expenses. Moore's Digest, International Law, vol. 1, p. 366, vol. 7, p. 937. In the course of his opinion deciding the question, the judge of the vice admiralty court said:

"By the affidavits upon which I granted a warrant it is certain that the Chesapeake, if a prize at all, is an uncondemned prize. For a belligerent to bring an uncondemned prize into a neutral port to avoid recapture is an offense so grave against a neutral state that it ipso facto subjects that prize to forfeiture. For a neutral state to afford such protection would be an act justly offensive to the other belligerent state."

At the prior hearing of the case, the court also said:

"I am of opinion that no use of a neutral territory for the purposes of war is to be permitted. I do not say remote uses, such as procuring provisions and refreshments and acts of that nature which the law of nations universally tolerates, but that no proximate acts of war are, in any way whatever, to be allowed to originate on neutral grounds."

This power on the part of the courts of the United States may not be given specifically by any statute, as required for the exercise of criminal jurisdiction, but arises from the authority reposed in them under the Constitution as courts of admiralty and common law, charged with the duty of administering the law of nations.

[3] *Third.* Respondents further maintain that the Appam and her cargo cannot be proceeded against in these causes, because title to the

same vested in the German government by reason of capture at sea by a German war vessel from an enemy country; that the Appam is a lawful prize of war, entitled to remain in the waters of the United States, a neutral power, without interference on the part of that government; and that its title can only be inquired into and divested by the action of the prize court of their own country.

No claim that the Appam is a public war vessel of the German Empire can be maintained under the facts of this case. Indeed, in the pleadings, the contention is not made, and on the contrary she is claimed to be a prize of war, which places her in an entirely different category as respects title and ownership. Under modern authority, title does not become vested in the captor of the prize by mere capture, and not until lawful condemnation is had by the proper court of the captor country. This is particularly true where the prize is not taken into the captor's country. In the Nassau, 4 Wall. 640, 18 L. Ed. 413, the Supreme Court of the United States said:

"It is the practice with civilized nations, when a vessel is captured at sea as a prize of war, to bring her into some convenient port of the government of the captor for adjudication. The title is not transferred by the mere fact of capture, but it is the duty of the captor to send his prize home, in order that judicial inquiry may be instituted to determine whether the capture was lawful, and, if so, to settle all intervening claims of property."

In the Manila Prize Cases, 188 U. S. 260, 23 Sup. Ct. 417, 47 L. Ed. 463, the Supreme Court said:

"Ordinarily the property must be brought in for adjudication, as the question is one of title, which does not vest until condemnation."

The Resolution, 2 Dall. 1, 5, 1 L. Ed. 263.

The reason of this rule is manifest, and arises from the fact that until lawful condemnation by a court of competent jurisdiction is had of the prize property, the title of the captor, as between himself and the owner, is incomplete and inchoate, and circumstances may readily arise, of which this case affords an example, in which the title of the captor might never become vested, by reason of his own act.

Nor is the contention tenable that the Appam and her cargo have the undisputed right to stay in the United States, and that that goverment cannot controvert her right, or this court entertain jurisdiction of these proceedings, and grant the proper relief to the libelants, irrespective of what the German prize court may do regarding the condemnation of the prize property. If the prize had been taken to a port of the captor country, or that of one of its allies, instead of to this, a neutral country, in violation of its laws, and of its international obligations to other countries, there would be great force in the position taken. Here, a very different situation arises, in which it is manifest that the claim that this court should wait, or be controlled by what the German prize court does, is without merit. This position as to the effect of the prize court proceedings of the captor country has been often taken, and nowhere more positively denied than by the Supreme Court of the United States; and the same may now be said to be generally settled adversely to the claim made.

In L'Invincible, 1 Wheat. 238, 4 L. Ed. 80, the court said:

"That the mere fact of seizure as prize does not, of itself, oust the neutral admiralty court of its jurisdiction is evident from this fact that there are acknowledged cases in which the courts of a neutral may interfere to divest possession; to wit, those in which her own right to stand neutral is invaded."

In The Divina Pastora, 4 Wheat. 52, 4 L. Ed. 512, the court said:

"But if, on the other hand, it was shown that the capture was made in violation of our neutral rights and duties, restitution would be decreed to the original owners."

In the Santissima Trinidad Case, 7 Wheat. 354, 355 (5 L. Ed. 454), supra, the Supreme Court further said:

"And (2) that 'where the property is already in the custody of a neutral tribunal, and the title is in litigation there, no other foreign court can, by its adjudication, rightfully take away its jurisdiction, or forestall and defeat its judgment.'"

Other cases sustaining these general views will be found in the same volume of Wheaton's Reports, The Santa Maria, 7 Wheat. 490, 5 L. Ed. 505; The Arrogante Barcelones, 7 Wheat. 496, 5 L. Ed. 507; The Monte Allegre, 7 Wheat. 520, 5 L. Ed. 513.

In the case of The Henrick and Maria, 4 C. Rob. 43, Lord Stowell said:

"Upon principle, therefore, it is not to be asserted that a ship brought into a neutral port is with effect proceeded against in the belligerent country. The res ipsa, the corpus, is not within the possession of the court; and possession, in such cases, founds the jurisdiction."

Dr. Lushington, the great authority on maritime matters, said:

"I wish it, moreover, to be expressly understood that this case is decided upon its own peculiar circumstances, and is not to be considered as a precedent for the condemnation of a prize while lying in a neutral port. The rule is that the prize shall be brought into a port belonging to the captor's country, and the court must guard itself against allowing a precedent to the contrary to be established." The Polka, Spinks Ecclesiastical and Admiralty Reports, 447.

In Dana's Note to Wheaton's International Law, 1866, it is said:

"But apart from any such practice of neutrals, it seems clear that to allow prizes to fly to a neutral port and remain there in safety while prize proceedings are going on in a home port, would give occasion to nearly all the objections that exist against prize courts in neutral ports. It seems therefore to be the tendency, if not the settled rule, now, that a decree of condemnation will not be passed against prizes remaining abroad, unless in case of necessity, or, if passed, will not be respected by other nations." Wheaton's Int. Law (8th Am. Ed.) § 391.

The further contention is made by the respondent that the violation of neutrality, to be cognizable, must be proved to have contributed to the capture, and that subsequent or otherwise unrelated violations are immaterial. This proposition the court cannot assent to; that is, that there may be no violations of neutrality after the prize is captured, entitling the belligerent owner to restitution at the hands of a neutral government, in whose country the property may be found. In this case, the fact should not be lost sight of that the violation of the neutrality of the United States is exceedingly closely related to the capture itself. This capture, it is true, was well away on the high

seas, but the captors of their own volition, and for their own purposes, determined not to take, or attempt to take, the prize to one of their own ports, or that of their allies, where alone the validity of the capture could be determined, though in distance not more than half so far away as the United States, nor to hazard longer the chances of her recapture at sea, but required the ship's officers and crew, under duress, to bring the ship into the nearest port of the United States, there to be laid up, and she was so brought, and the effort to secure permission to lay up was unsuccessfully made. From the moment of the capture, to that of entering the Virginia Capes, the Appam and her cargo were subject to recapture by the ships of the owner's country or that of their allies, or to be retaken by the owner. Should other or greater rights be secured by taking refuge in the harbor of a neutral, which the Appam had no right to enter without flagrantly violating the laws of neutrality? Does not such violation, having for its object the getting away with the prize and the safe-keeping of the same, so relate back to the original seizure as to become a part thereof? Is not the capture, the flight to a supposed place of safety, and the successful entry therein, but one continuous occurrence, and should she, thus attempting to avail herself of the use of neutral waters for the purpose of escape with her prize, in contravention of the laws of neutrality, do so without at the same time incurring the consequences of the violation? The failure to take, or even attempt to take, the prize to a port of the captor's country, or that of an ally, where prize proceedings could regularly and lawfully have been inaugurated, should prevent the captor from denying to the owner a day to be heard in the courts of the neutral country, where, of choice, the prize had been brought and deposited, respecting his right to restitution of his property by reason of the violation of the neutrality of such neutral country. The validity of the capture, as well as all questions of prize law, are to be determined by the German prize court, and are not matters for the consideration of this court; but this court has the right to determine whether the neutrality laws of the United States have been violated, and the consequences thereof, as bearing upon the restitution of the prize property to its owners (The Estrella, 4 Wheat. 308, 4 L. Ed. 574), and in a proper case to restore the same to them.

The court's conclusion is that the manner of bringing the Appam into the waters of the United States, as well as her presence in those waters, constitutes a violation of the neutrality of the United States; that she came in without bidding or permission; that she is here in violation of law; that she is unable to leave for lack of a crew, which she cannot provide or augment without further violation of neutrality; that in her present condition, she is without lawful right to be and remain in these waters; that she, as between her captors and owners, to all practical intents and purposes, must be treated as abandoned, and stranded upon our shores; and that her owners are entitled to restitution of their property, which this court should award, irrespective of the prize court proceedings of the court of the imperial government of the German Empire; and it will be so ordered.